James E. FITCH, Carolyn Antinelli, Robert K. Lee, Lloyd I. Maclean, William E. Gibson, John Wilson, Eugene T. Oliver, Donald L. Cramer, Richard P. Mangan, Josephine D. Scaccia, Robert J. Walczak, William W. Malanowski, Milton B. Mason, Allen A. Platt, for Themselves and as Class Representatives, Plaintiffs,

v.

CHASE MANHATTAN BANK, N.A., the Retirement and Family Benefits Plan of Chase Manhattan Bank, N.A. and Richard Shinn, Robert Field and James Riordan, as Named Fiduciaries of the Retirement and Family Benefits Plan of the Chase Manhattan Bank, N.A., Defendants.

No. 95–CV–6212 CJS.

United States District Court, W.D. New York.

June 16, 1999.

Lonny H. Dolin, Dolin & Modica, Rochester, NY, for plaintiffs.

Eugene D. Ulterino, Nixon, Peabody LLP, Rochester, NY, for defendants.

### DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action in which former employees of the defendant Chase Manhattan Bank seek additional retirement benefits pursuant to ERISA, 29 U.S.C. § 1001, *et seq.* Now before the Court are the par-

ties' cross-motions for summary judgment [# 33][# 42]. For the reasons that follow, the plaintiffs' motion is denied, and the defendants' motion is granted.

## BACKGROUND

The relevant facts are not disputed. Until July of 1984, all plaintiffs were employed by Lincoln First Bank ("Lincoln") and were participants in Lincoln's retirement plan (the "Lincoln Plan"). In July of 1984, Lincoln was merged into the Chase Manhattan Bank ("Chase"), and was renamed Chase Lincoln First Bank ("Chase Lincoln"). Chase had its own retirement plan (the "1976 Chase Plan"), which provided better benefits than the former Lincoln plan. Rather than allowing the Chase Lincoln employees to join the more beneficial Chase plan, Chase created the Chase Lincoln Plan. Under the Chase Lincoln Plan, at retirement, former Lincoln employees would receive the greater of a) the accrued benefit under the Lincoln Plan as of the merger date [July 31, 1984], plus the Chase Lincoln Formula from that date onward; or b) the Lincoln Plan benefit for the participant's entire career, both with Lincoln First before July 31, 1984, and with Chase Lincoln after July 31, 1984.[1] (See, Chase Lincoln plan, Article IV, Section 4.01(c),(d) and Appendix A). On January 1, 1988, the Chase plan and the Chase Lincoln plan were merged, therefore the plaintiffs became participants in the Chase Plan. The Chase Plan is an employee pension benefit plan as defined by ERISA, 29 U.S.C. § 1002(2), and is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.* Under the merged Chase Plan, the plaintiffs continued to have their benefits calculated as they had been under the Chase Lincoln plan. (See, 1989 Chase Plan, Appendix VIII). Both the Chase Lincoln plan and the Chase Plan

calculate benefits using a "final-pay formula" based upon final average compensation and years of service, however the two plans calculate benefits differently. Among other differences, the Chase Lincoln formula has a "30–year stepdown," under which former Lincoln employees accrue benefits at a lower rate during their thirty-first through fortieth years of benefit service. For those years of service, a lesser percentage of final average compensation is used to determine the benefit. (Ulterino 2, Appendix A). The Chase Plan was amended again, effective January 1, 1989, however the plaintiffs were "grandfathered" and continued to have the option of having their benefits calculated as before.

Sometime prior to September of 1994, John Farrell, Director of Human Resources for Chase and Administrator of the Chase Plan, began planning an early retirement incentive program designed to reduce the corporation's expenses. Farrell projected that a Voluntary Retirement Program ("VRP") could save Chase approximately $55 million in annual operating costs. As the incentive for employees to take early retirement, the VRP would add five years to an employee's age and years of benefit service.

On October 13, 1994, Farrell presented his VRP proposal to the Chase Board of Directors. Farrell's memo set forth the general details of the proposed VRP, and stated that "[t]he program will be available for acceptance only during the 'window' period beginning on October 28, 1994 and ending on December 12, 1994."(Ulterino Affidavit [# 38] Exhibit 9, p. 6437). The memo further stated, in relevant part: "ELECTION PERIOD: 'Window' open for election October 28 to December 12, 1994. Legal and competitive review indi-

---

1. Even though the Chase Formula was more generous than the Chase Lincoln formula, it was possible that using the Chase Lincoln formula for all years of service could result in higher benefits for certain employees, such as the plaintiffs, who had significant Lincoln ser-

vice, worked for Chase Lincoln after the merger, received significant salary increases after the merger, and decided to retire a few years after the merger. (Defendants' Memorandum of Law [# 37], p. 3, n. 3).

cates that this is a reasonable time period."(Ulterino Affidavit [# 38], Exhibit 9, p. 6807).

On October 17, 1994, the Chase Board of Directors passed a resolution authorizing the VRP. (Chase Plan, Appendix VIII). That Resolution stated, in relevant part:

RESOLVED, that the recommendation of Compensation Committee with respect to the amendment of [the Retirement Plan] . . . in order to establish and offer the proposed Voluntary Retirement Program described in the memorandum which has been presented to this meeting be, and it hereby is, approved, and that the Executive Vice President and Human Resources Executive of this Bank [Farrell] and such other officers as he shall designate be, and each of them hereby is, authorized and directed to adopt such specific amendments to the Retirement Plan . . . to the extent necessary to conform to the amendments to the Retirement Plan authorized by this resolution, as in their judgment shall be necessary or appropriate to carry out such recommendation.

    \*     \*     \*     \*     \*     \*

RESOLVED, that the officers of this Bank be, and each of them hereby is, authorized, in the name and on behalf of this Bank, to perform all such further acts, and to execute and deliver all such further agreements or other writings, as they may deem advisable in order to carry out the intent of the foregoing resolutions.

(Ulterino Affidavit [# 38], Exhibit 11).

On or about October 18, 1994, Chase sent two letters to each of the plaintiffs, informing them of the upcoming VRP. The letters informed them, inter alia, that they would receive specific details of the VRP by the end of October, and that they would have to make an election on whether or not to participate by December 12, 1994, and that if they elected to participate, they would have to actually retire by December 31, 1994. As mentioned earlier, the incentive to retire was the addition of five years of service credit and five years of age for purposes of calculating retirement benefits.

In August or September of 1994, Chase had retained an actuarial firm, Buck Consulting Group ("Buck"), to perform benefit calculations for Chase Plan employees who were eligible to take early retirement under the VRP. (Ulterino 7, p. 152). Once the VRP was approved, Buck was responsible for calculating the individual VRP enhancements. The plaintiffs admit that Buck is "one of the largest and most reputable actuarial firms in the country." (Plaintiffs' Memorandum of Law [# 43], p. 21). One of Buck's employees, Mary Beth McBride, was responsible for preparing individual benefit estimates for the eligible former Chase Lincoln employees based using information provided by Chase. The Chase Lincoln formula was the final pay formula applicable to the plaintiffs, and as mentioned earlier, that formula includes a "step-down" for service between years 30 and 40. However, McBride failed to take this "step-down" into consideration when she created the computer program for computing benefit estimates. This error resulted in erroneously-high benefit estimates for 61 employees, including plaintiffs.

Chase gave Buck a list of sixteen former Chase Lincoln employees, for which Buck was supposed to prepare sample benefit estimate calculations. The list of sixteen employees included two of the plaintiffs, Antinelli and Maclean. (Ulterino Affidavit [# 38], Exhibit 19, p. 500475). Once McBride prepared these test calculations, she was supposed to send them to Peggy McEachen, an employee of the Chase Human Resources department, who was responsible for verifying the accuracy of the calculations using a Lotus Spreadsheet which she had prepared for that purpose. (Ulterino Aff, Ex. 13, p. 152). Since McEachen's program was properly programmed to account for the "30–year step-

down," it could have detected the error if McEachen had tested one of McBride's erroneous estimates. However, McBride sent only "five or so" calculations to McEachen, who performed tests on those calculations. (Ulterino Affidavit [# 38], Exhibit 13, McEachen Dep. p. 159). McBride states that she sent "several" test cases to McEachen, but she can only positively identify two cases, one for an employee named Hasman and one for an employee named Adams (Ulterino Aff, Ex. 14, p. 36). On one of the test cases, McEachen's calculations did not match McBride's. (Ulterino Aff. Ex. 13, p. 161). However, after speaking with McBride, and after consulting others at Chase, McEachen concluded that the discrepancy was related to an error involving Social Security benefits. (Ulterino Aff, Ex 13, pp. 161–166). It is unclear whether or not McEachen re-tested the calculation that she had initially found to be incorrect. McEachen then had McBride run additional sample estimates, and McEachen states that she tested these and found no disrepancies. (Ulterino Aff, Ex. 13, p. 166). McEachen believes that she missed the error because Buck did not provide her with any samples involving the 30–year stepdown. (Ulterino Aff, Ex. 13, p. 254). However, the plaintiffs contend that the Adams sample did implicate the "30–year stepdown." [2] It appears clear from the record, however, that McBride's error would have been discovered if McBride and McEachen had tested the sixteen names on the list of test cases which Chase sent to Buck. However, that did not happen, and McEachen approved McBride's erroneous calculations. As a result, on October 24, 1994, Buck delivered its erroneous calculations to the printer who was to prepare the personalized benefit statements for those employees who were eligible for the VRP.

On October 28, 1994, Chase delivered a VRP information package to each of the plaintiffs. The packages included a summary plan description of the VRP, and an Acceptance and Release Form. The VRP Summary Plan Description ("SPD") accurately set forth the terms of the VRP. The VRP SPD booklet also stated, in relevant part, that "[t]he back pocket of this booklet contains a personalized statement of your Retirement Plan benefits which illustrates your estimated benefit under the Voluntary Retirement Program." (Ulterino Affidavit [# 39], Exhibit 31, p.2). This estimate, entitled "Schedule B," listed the monthly benefits available to each recipient using various forms of payment and equalizing options. At the bottom of each Schedule B is the following notice:

These benefits are based on Chase Retirement Plan provisions, current Social Security law, and continued employment through your retirement.

Final Average Earnings are based on your compensation history.

PLEASE NOTE—The amounts shown above may change as a result of:

(1) Revision of the Social Security law.

(2) Use of actual versus estimated Social Security earnings history.

(3) Plan amendments to comply with legislation.

(Plaintiffs' Memorandum of Law [# 43], Exhibit 1, p. 2622). In order to accept the VRP, participants had to submit a completed Acceptance and Release Form by December 12, 1994. Participants could revoke their acceptances within seven days, after which, the election to take early retirement became irrevocable.

Because Buck had failed to account for the "30–year stepdown" in its calculations, the plaintiffs' benefit estimates were erro-

---

**2.** The plaintiffs contend that McEachen's failure to detect the error in the Adams sample establishes that she did not test even the two estimates that McBride can prove she sent. However, while the record is unclear, it appears that the Adams estimate may have been the estimate which McEachen believed was incorrect due to erroneous Social Security benefit information. However, if this is true, it would appear that McEachen failed to re-test Adams' sample after making what she believed was the necessary correction.

neously high. The overstatement of monthly benefit payments ranged from a high of $747 to a low of $3. The average overstatement of monthly benefits was $389. This error only affected estimates for employees with more than twenty-five years of service.[3] The VRP was offered to approximately 2,200 Chase employees, however, the aforementioned error affected only 61 employees, which is less than 3%.

During the weeks following the issuance of the VRP packages, some employees attempted to calculate their own benefits, but could not make their figures match the erroneous estimates contained in their VRP packets, and accordingly, they notified Chase's Human Resources staff about this problem. Some of the problems that employees were experiencing was due to the fact that incorrect personal data had been used in preparing their estimates. As to these types of problems, where the error was apparent, Chase personnel made the necessary corrections and had new estimates prepared. However, for other employees, such as certain of the plaintiffs, who could not make their calculations match the estimate on Schedule B, Chase staff told the employees that the discrepancy had to be due to the fact that the VRP estimates used estimated Social Security information. The Chase staff refused to recalculate the estimates at that time, but told employees that they would recalculate the benefits once the actual Social Security information was obtained. McEachen, who was one of the persons responsible for conducting counseling sessions with VRP-eligible employees, told persons who requested recalculations that she would recalculate benefits when she was finished with the counseling sessions. On or about October 31, 1994, one of the plaintiffs, Eugene Oliver, contacted McEachen and told her that he could not get his own pension benefit calculations to match those that were contained on Schedule B

of his VRP packet. In response, McEachen assured him that the figures he received in his VRP packet were correct. (Oliver Affidavit [# 44] pp. 9–10). Most of the plaintiffs claim that during counseling sessions, they were reassured that the benefit figures contained in their VRP packets were correct.

On or about November 21, 1994, McEachen was contacted by a service center manager at National Bank of Westchester, a Chase affiliate also participating in the VRP, regarding an employee named Mr. O'Malley, who was unable to reconcile his personal calculations with the VRP estimate he had been provided. At that point, McEachen attempted to calculate O'Malley's benefits, and discovered a discrepancy. On November 22, McEachen contacted McBride at Buck regarding this employee's estimate. On November 23, McBride discovered that Buck's program failed to account for the "30–year step-down." That same day, which was the day before Thanksgiving, McBride called McEachen and left a voice mail message stating that "she found a problem with the 30–year step-down and she was working on it."(Ulterino Affidavit [# 38] Exhibit 13, p. 216). McEachen received McBride's message on November 25, the day after Thanksgiving. After the discovery of the error, McEachen and McBride first spoke to each other on November 28, the Monday after Thanksgiving. At that time, McBride explained the programming error to McEachen. On November 30, McEachen informed her managers at Chase about the error. McEachen's supervisors directed her to identify the persons effected by the error, recalculate the benefit estimates, and inform the effected employees "as quickly as possible." Chase contends that while it wanted to let those effected know as soon as possible, it did not know exactly who was effected until the calculations were redone. Moreover, Chase did not want to notify the effected

---

**3.** Employees with more than 25 years of service who took the VRP had five years of

benefit service added, thereby implicating the 30–year step-down.

employees until it had the corrected figures. (Ulterino Affidavit [# 38], Exhibit 7, Markuson Deposition, p. 224–25, 290; Exhibit 8, Kuchar Deposition, pp. 205–206). McEachen completed the recalculation of the benefits on or about December 6, 1994.

Between December 6 and December 8, Chase orally informed most of the plaintiffs about the error. On December 8, Chase also issued a memo which informed the plaintiffs of the error in the benefit estimates they had received. Some of the plaintiffs did not actually receive this memo until December 10.[4] The memo contained a corrected benefit estimate and also informed the affected employees that the deadline for making an election would be extended by one week, until December 19, 1994, and that the employees would have until December 27, 1994 to revoke their acceptance of the VRP. Chase contends that this extension of the deadlines was authorized by the October 17, 1994 Board of Directors Resolution authorizing the VRP. The plaintiffs contend that they were not notified that they had the right to revoke their acceptances, however, the Court notes that the Chase memo dated December 8, 1994 clearly states, in relevant part:

> In order to provide you with time to consider these revised calculations, your acceptance deadline has been changed to December 19, 1994. You must have your acceptance letter or decline letter to Human Resources by that date. **You will have until December 27, 1994 to revoke your acceptance of this program.**

(Ulterino Affidavit [# 38], Exhibit 20)(Emphasis added). Moreover, the plaintiffs' deposition testimony demonstrates they were aware they had the right to revoke their acceptances of the VRP.

To participate in the VRP, the plaintiffs each had to sign an Acceptance and Release Form, which states, in relevant part, that the incentive under the VRP is to receive an additional five years of benefit service, subject to a maximum of 40 years, and an additional five years of age. The Acceptance and Release Form does not set forth a specific dollar amount of monthly benefit. (Plaintiffs' Memorandum of Law [# 43], Exhibit 2).

Despite the reduction in their initial benefit estimates, none of the plaintiffs elected to revoke their acceptance of the VRP. A few of the plaintiffs contend that they did not revoke because they believed that Chase was going to eliminate their positions in the near future. Some of the plaintiffs contend that they felt they could not revoke and go back to work for Chase because they had lost faith in Chase after being given incorrect benefit estimates. One of the plaintiffs, Antinelli, had actually decided to retire prior to the announcement of the VRP. Two of the plaintiffs, Fitch and Lee, had already taken other employment at the time they were given the option to revoke their acceptance of the VRP, but that is not why they chose not to revoke. Each stated that he did not want to return to Chase because they felt they had been mistreated, and in addition, Lee wanted to spend time caring for his wife. (Ulterino Affidavit [# 51], Exhibit 42, p. 84, Exhibit 43, pp. 119–121).

On February 3, 1995, one of the plaintiffs, Walczak, wrote to Farrell, the Plan Administrator, and requested that Chase provide him with the level of benefits stated in the original VRP estimate. On March 7, 1995, Farrell notified Walczak that Chase would not pay him the benefits as originally estimated. Walczak appealed this decision to the Named Fiduciaries, and raised two claims on appeal. First, he claimed that he was entitled to receive the

---

**4.** The plaintiffs contend that one plaintiff, Josephine Scaccia, never received this memo, and that she only learned about the error in her VRP estimate when she received her first benefit payment. (Plaintiff's Memorandum of Law [# 43] Exhibit 63). However, this is contradicted by Scaccia's affidavit, which states that she received the memo on December 10, 1994. (Scaccia Affidavit [# 44], p. 13, ¶ 24).

amount of benefits erroneously stated in the first VRP estimate. Second, he claimed that he was entitled to have his benefits calculated under the Chase formula for all years of service, even for those years he was employed by Lincoln First. As for this second contention, while the plaintiffs did assert such a claim in their amended complaint, it appears that they have now abandoned this theory, inasmuch as they do not attempt to rebut the arguments made in the defendants' memorandum of law on this point. (Defendants' Memorandum of Law [# 37] pp. 30–31).

Under the 1989 Chase Plan, the named fiduciaries had been given, inter alia, the following power to review claims:

13.11 *Power to Construe.* The Named Fiduciaries shall have power to construe the provisions of the Retirement Plan and to determine any questions of fact which may arise thereunder.

However, on December 22, 1994, after the plaintiffs had elected to retire, but before Walzack's claim or appeal, Chase adopted the Eighth Amendment to the Chase Plan, subsection 9, which changed the powers of the named fiduciaries as follows:

Effective January 1, 1989, Section 13.11 is amended in its entirety to read as follows: The Named Fiduciaries shall have full discretionary power to construe and interpret the provisions of the Retirement Plan and to determine any questions of fact and eligibility for benefits which may arise under the Retirement Plan.

The Named Fiduciaries denied Walczak's appeal. The Fiduciaries' denial letter states, in relevant part:

With respect to ... your claim relating to the initial incorrect estimate of your monthly benefit under the 1994 Voluntary Retirement Program ("VRP"), the Named Fiduciaries have determined that an initial estimate of the type that you received cannot require a Plan payment that is not provided for in the terms of the Plan. The jurisdiction of the Named Fiduciaries is limited to the determination of claims to benefits under the terms of the Plan, so that, in the absence of Plan terms providing for the payment of a benefit, any claim for such a benefit from the Plan must be denied. The Named Fiduciaries also note that the initial estimate was promptly corrected by the Bank and that you were also given an opportunity to revoke your VRP election.

(Plaintiffs' Memorandum of Law [# 43], Exhibit 75).

The plaintiffs commenced this action on May 11, 1995. In this action, the plaintiffs have asserted the following causes of action: 1) violation of ERISA, 29 U.S.C. § 1132(a)(1)(B), in that the defendants denied them benefits to which they are entitled under the Chase Plan; 2) violation of ERISA, 29 U.S.C. § 1132(a)(1)(B), in that the defendants *intentionally* denied them benefits; 3) equitable estoppel; 4) breach of fiduciary duty under ERISA, 29 U.S.C. § 1104(a)(1), entitling the plaintiffs to equitable relief under 29 U.S.C. § 1132(a)(3); and 5) intentional breach of fiduciary duty. The plaintiffs contend that the erroneous benefit estimates are terms of the pension plan, and that they are therefore entitled to receive the amounts stated in those initial estimates. They further allege that Chase intentionally misled them in order to increase the number of employees taking early retirement, thereby increasing cost savings to the bank. Moreover, the plaintiffs contend that they made the decision to take early retirement based upon the inaccurately high estimates provided by Chase, and that Chase should therefore be equitably estopped from denying them benefits as originally stated. The plaintiffs further claim that Chase breached its fiduciary duty by entrusting the creation of the estimates to McEachen, who they allege did not have the proper experience for such a task. Finally, they contend that Farrell, the Plan Administrator, did not have the authority to extend the deadline for making the VRP election.

In response, the defendants contend that the VRP estimates were only estimates, not part of the actual plan or plan summary, and that the plaintiffs are receiving all the benefits to which they are entitled under the plan, because they have received five extra years added to their ages and years of service. The defendants also contend that they cannot be estopped from denying benefits unless there are "extraordinary circumstances" tantamount to fraud, and that their error was an honest mistake, not fraud. However, the defendants argue that even if there were "extraordinary circumstances," that the defendants still could not be estopped, because the plaintiffs cannot show detrimental reliance. Finally, the defendants contend that there was no breach of fiduciary duty, and that pursuant to the Board of Directors' resolution approving the VRP, Farrell had full authority to extend the deadlines for acceptance and revocation.

In November of 1996, following the commencement of this action, purportedly pursuant to the October 17, 1994 Board of Directors Resolution, Farrell adopted Appendix XIII to the Chase plan, which sets forth the details of the VRP, and which states, in relevant part, that "[i]n ·exceptional circumstances, the Named Fiduciaries, or their delegate, may extend the Election Period (and the revocation period) as they determine to be necessary or appropriate to ensure the proper operation of the 1994 VRP." (Ulterino Affidavit [# 38], Exhibit 12, p. 7416).

The Court has thoroughly reviewed the parties' written submissions and has carefully considered the oral arguments of counsel.

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."· Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

## I. Claim For Benefits Under. the Plan Pursuant to 29 U.S.C. § 1132(a)(1)(B)

█ The plaintiffs' first two causes of action are pursuant to 29 U.S.C. § 1132(a)(1)(B), which states, in relevant part, that

[a] civil action may be brought—

(1) by a participant or beneficiary—

\* \* \* \* \* \*

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

As a preliminary matter, the Court must determine the appropriate standard of review under which to review the fiduciaries' decision. ERISA does not set forth a standard of judicial review of benefit determinations by fiduciaries or plan administrators. However, in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that

> [c]onsistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.* at 115, 109 S.Ct. 948. Here, it is clear that the plan contains language that gives the fiduciaries fairly broad discretion, and which, under *Firestone,* would require the Court to apply an arbitrary and capricious standard of review. The plan, as it existed at the time of Walczak's appeal, states, in relevant part, that

> [t]he Named Fiduciaries shall have full discretionary power to construe and interpret the provisions of the Retirement Plan and to determine any questions of fact and eligibility for benefits which may arise under the Retirement Plan.

(1989 Chase Plan, Section 13.11, as amended on December 22, 1994). It is the defendants' position that the plan as amended controls. The plaintiffs do not specifically address this contention, but rather base their arguments on the original version of Section 13.11.[5] The Court finds that the arbitrary and capricious standard would be required even if the Court refers to the earlier version of Plan Subsection 13.11, which states: "13.11 *Power to Construe.* The Named Fiduciaries shall have power to construe the provisions of the Retirement Plan and to determine any questions of fact which may arise thereunder." This language is at least as broad as that found by the Second Circuit in *Jordan* to require an arbitrary and capricious standard.[6] Accordingly, the Court finds that the arbitrary and capricious standard of review is appropriate here, regardless of which version of Subsection 13.11 it applies.

■ However, even where the arbitrary and capricious standard is appropriate, the existence of a conflict of interest may require a court to apply a stricter level of scrutiny. As the U.S. Supreme Court held in *Firestone,* "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. 948 (citation and internal quotation marks omitted). The Second Circuit has held that

> in cases where the plan administrator is *shown to have a conflict of interest,* the test for determining whether the admin-

---

**5.** It is noteworthy that the plaintiffs in the companion case of, *Boesel, et al. v. Chase Manhattan Bank,* 62 F.Supp.2d 1015 (W.D.N.Y.1999), who are represented by the same counsel as the plaintiffs in this matter, did specifically contend that the Court should not apply the amended version of Section 13.11, since it was not adopted until December 22, 1994, a date subsequent to December 19, 1994, when the plaintiffs' election to take early retirement become irrevocable. In the papers submitted in connection with this action, for unknown reasons plaintiffs have not

made this same argument, but have addressed their contentions to the earlier version of Chase Plan Section 13.11, without addressing the fact that this section had been amended at the time of Walczak's appeal.

**6.** The language found to require an arbitrary and capricious standard of review in *Jordan* is as follows: "The Retirement Committee shall pass upon all questions concerning the application or interpretation of the provisions of the Plan." 46 F.3d at 1269.

istrator's interpretation of the plan is arbitrary and capricious is as follows: Two inquiries are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo.

*Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996)(emphasis added). Thus, as a threshold matter, a plaintiff must demonstrate the existence of an actual conflict of interest. Here, the plaintiffs contend that a conflict of interest does exist, because Farrell, the plan administrator who initially denied Walczak's claim, is an employee of Chase. (Plaintiffs' Memorandum of Law [# 43], p. 11). However, "the simple fact that the administrator of a plan ... happens to be 'an arm of the employer' does not in itself create a conflict of interest." *Jordan*, 46 F.3d at 1274. Nor have the plaintiffs otherwise shown that Farrell had a conflict of interest. Moreover, the Court here is not reviewing Farrell's determination, but rather the determination of the named fiduciaries, none of whom are current or former employees of Chase. Accordingly, the plaintiffs have failed to demonstrate that the fiduciaries acted under a conflict of interest.

▬ The Court must now analyze whether the fiduciaries' decision was arbitrary and capricious. As the Second Circuit held in *Jordan*,

[t]he arbitrary and capricious standard of review is highly deferential to a plan administrator. The question before a reviewing court under this standard is "whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." The court may not upset a reasonable interpretation by the administrator.

46 F.3d 1264, 1271 (citations and internal quotation marks omitted). "The issue is whether the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law. Substantial evidence in turn is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." *Maida v. Life Ins. Co. of North America*, 949 F.Supp. 1087, 1091 (S.D.N.Y.1997) (citations and internal quotation marks omitted). In evaluating whether a fiduciary's determination is arbitrary and capricious, courts have considered such factors as the language, purpose, intent and history of the plan, including past interpretation and administration of the plan. *O'Neil*, 37 F.3d at 59–60. In an ERISA action, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). ERISA requires that employers file copies of their benefit plans and summary plans with the Secretary of Labor, and that employers provide their employees with copies of the plan summary. *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir.1990). Where, as here, an employer provides employees with a plan summary but not the actual plan, the terms of the plan summary will be enforced over any conflicting terms of the plan. *Heidgerd*, 906 F.2d at 907. However, absent a showing of proof tantamount to fraud, ERISA plans cannot be amended as a result of informal communications between an employer and plan beneficiaries. *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988).[7]

---

**7.** *Moore's* holding referred specifically to ERISA welfare plans, however, courts have cited *Moore* in decisions involving ERISA

pension plans. *See, e.g., Snyder v. Elliot W. Dann Co., Inc.*, 854 F.Supp. 264, 271–72

■ Applying the foregoing principles of law to the facts of this case, the Court finds, as a matter of law, that the fiduciaries' determination was not arbitrary and capricious. In fact, for the reasons that follow, the Court concurs with the fiduciaries' determination, and would have reached the same conclusion even if it had applied a de novo standard of review.

The success or failure of the plaintiffs' first two causes of action depend upon whether or not the estimates contained in Schedule B of the VRP materials constitute "terms of the [Chase] plan." Relying upon *Heidgerd,* the plaintiffs contend that the personalized benefit estimates distributed to them along with the VRP materials are part of the SPD and are therefore enforceable terms of the retirement plan. However, the defendants contend that pursuant to *Moore,* 856 F.2d at 492, the benefit estimate is only an "informal communication" that cannot amend the terms of the Chase Plan in the absence of proof tantamount to fraud on Chase's part.

The most closely analogous case on this point which the Court could find is *Flacche v. Sun Life Assurance Co. of Canada,* 958 F.2d 730 (6th cir.1992). In that case, an employee retired and began receiving monthly pension benefit checks in the erroneously overstated amount of $4,846, and he was sent a "Summary of Benefits Certificate" which also reflected the $4,846 figure. Between June of 1986 and December of 1988, the plaintiff continued to receive overpayments. Also during that period, and in reliance upon the pension payments that he was receiving, the plaintiff retired from a second job. However, effective January 1, 1989, the employer corrected its mistake and began making monthly payments to the plaintiff that were approximately $1,500 less than he had been receiving. *Id.* at 732. The employee then sued, alleging, inter alia, a violation of 29 U.S.C. § .1132(a)(3)(B), apparently relying upon Sixth Circuit case law which is similar to the Second Circuit's holding in *Heidgerd.* The Court noted that "[a] substantial line of case law exists that imposes liability based upon reliance on misstatements or errors in the Summary Plan Description ("SPD"), even when the misstatements conflict with the plan itself." However, the Court held that there was no liability under ERISA, because the Summary of Benefits Certificate was not an SPD. *Id.* at 736.[8]

Similarly, this Court finds that in the instant case, the benefits estimates provided to the plaintiffs along with their VRP materials are not terms of the Chase Plan or the VRP SPD, and therefore, they are not subject to enforcement under the holding in *Heidgerd.* Rather, as the VRP SPD stated, the personalized statements are illustrations of estimated benefits. As such, the estimates are not part of the substantive terms of the SPD, although they were intended to illustrate the potential effect of the VRP on particular employees. Although they were distributed along with the VRP SPDs, which are undoubtedly not "informal communications," the benefit estimates themselves are akin to the "informal communications" which, in *Moore,* were held to be incapable of amending the plan. *See, Moore,* 856 F.2d at 492.

The *Heidgerd* decision is also inapplicable because this is not a case where the plaintiffs were given a plan summary that conflicted with the actual plan which the plaintiffs were not given. Rather, this is a

(S.D.N.Y.1994); *Kietlinski v. General Electric Co.,* 886 F.Supp. 994, 999 (N.D.N.Y.1995).

**8.** The Court notes that, unlike the plaintiffs in the instant case, the plaintiffs in *Flacche* did not allege that the benefits summary was part of the SPD. Despite this, the Sixth Circuit specifically held that the benefits summary was not an SPD. The Court also notes that in

*Flacche,* the benefits summary was not issued directly by employer, but was issued by the insurance company from whom the employer had purchased a group annuity contract. However, that distinction does not appear to have been the basis for the Sixth Circuit's holding that the benefit summary was not an SPD.

case where the plaintiffs were given the accurate plan document, the VRP SPD, along with an estimate which contained what is essentially a typographical error. It is undisputed that the VRP SPD accurately described the terms of the VRP, so that the plaintiffs understood that if they retired early, they would receive an additional five years of age and five years of benefit service. The only thing that was inaccurate was the mathematical calculation illustrating the monthly benefit that each plaintiff would receive.

Moreover, the plaintiffs here were explicitly told that the estimates were subject to change based upon revision of the Social Security law, the use of actual versus estimated Social Security earnings history, and/or plan amendments made to comply with legislation. The Court finds that it was also implicit that the estimates were subject to change based upon mistake. If the mistake had been in the bank's favor, one cannot seriously imagine that the plaintiffs would have accepted the error as being a term of the plan. Instead, and as should be clear to anyone, at that point the plaintiffs would have argued, correctly, that regardless of the erroneous estimate, they were not receiving the benefits that they are entitled to using the calculations contained in the VRP SPD. The defendants here are merely making that same argument.

The Court does not intend to minimize the obvious importance of these personalized statements as they relate to an employee's decision whether or not to take early retirement. However, the Court finds that in this case, they simply were not a term of the plan or the plan summary that is subject to enforcement under 29 U.S.C. § 1132(a)(1)(B). Accordingly, the defendants' are entitled to summary judgment on the plaintiffs' first and second causes of action.

## II. Equitable Estoppel

It is well settled that a cause of action for equitable estoppel exists under the federal common law in an ERISA action. *See, Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 78 (2d Cir.1996), *cert. den.*, 519 U.S. 1008, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996). The elements of an equitable estoppel claim in an ERISA action are: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Id.* at 79. However, the plaintiff must first demonstrate the existence of "extraordinary circumstances." *Id.* at 78 (*citing Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993)). The Second Circuit Court of Appeals recently clarified the meaning of "extraordinary circumstances" in *Devlin v. Transportation Communications International Union*, 173 F.3d 94 (2d Cir.1999). The Court stated, in relevant part:

> In our view, the remarkable consideration in *Schonholz* was the defendants' use of promised severance benefits as an inducement to persuade Schonholz to retire.... [I]t was as though the Medical Center had *intentionally* used the promise of severance benefits to win Schonholz's resignation, *and then reneged once she resigned.*

*Devlin*, 173 F.3d at 102. (Emphasis added). In other words, it would appear that a finding of "extraordinary circumstances" requires proof tantamount to fraud. In *Devlin*, the Court found that there were no extraordinary circumstances, even though there was evidence that some of the defendant's employees had relied upon the employer's misrepresentations in making a decision to retire, because there was no evidence that the employer had intentionally made misrepresentations in order to induce action by its employees. *Id.*

Based upon the holding in *Devlin*, the Court here finds that the plaintiffs have not demonstrated "extraordinary circumstances" so as to entitle them to pursue a cause of action for equitable estoppel. The *Devlin* decision holds up the facts of *Schonholz* as a yardstick for measuring "extraordinary circumstances." The facts

of the instant case, however, are easily distinguishable from those of *Schonholz.* In *Schonholz,* the employee was induced to resign based upon the representation that she would be paid certain severance benefits, but after she actually resigned, the employer reneged. Here, the instant record does not support a finding that the defendants acted intentionally. Moreover, the defendants did not use a misrepresentation to actually induce the plaintiffs to retire, but rather, they notified the plaintiffs of the error and gave them an opportunity to return to the status quo ante. Accordingly, the Court finds that there are no extraordinary circumstances in this case warranting a claim of estoppel.

It is true that the plaintiffs repeatedly allege, in a conclusory fashion, that the defendants acted intentionally and fraudulently. For example, the plaintiffs memorandum of law states, in relevant part, that

> Defendants purposely and willfully violated their fiduciary duties by providing Plaintiffs with inaccurate information in the VRP SPDs without their accuracy being verified in a way that met ERISA's fiduciary standards. After receiving actual notice and conclusive proof that the VRP formula was flawed, Defendants compounded their breach of duty by intentionally and fraudulently covering up their mistakes while allowing Plaintiffs to continue to rely on false information in order to meet Chase's corporate goal of $55 million savings annually.

(Plaintiffs' Memorandum of Law [# 43], p. 2). Throughout the plaintiffs' papers, they allege that the defendants intentionally provided them with false estimates, in order to trick as many employees as possible into taking early retirement, thereby saving Chase money that it otherwise would have had to pay in salaries. However, the Court finds that the plaintiffs have not come forward with evidentiary proof in admissible form to support these claims. Instead, the evidence in the record clearly shows that the incorrect estimates were the result of an honest mistake on the part of Buck Consulting, that went unnoticed by Chase. It is undisputed that Chase included two of the plaintiffs' names on the list of benefit samples to be tested, and that, but for the actions of McBride and McEachen, the error would have been caught. Also, as far as the Court is aware, the error affected only 61 of the 2,200 employees who were eligible for the VRP. Moreover, the error only effected former employees of Lincoln First, whose benefit formula was calculated differently than most other Chase employees. Finally, Chase discovered the error, gave the plaintiffs corrected figures, and gave them the option of revoking their acceptance of the VRP. Accordingly, the plaintiffs' theory that this was an intentional cost-saving measure by Chase seems absurd. The record establishes that at worst, McBride and McEachen may have been negligent in failing to catch the error and in failing to notify the plaintiffs sooner. "However, arguments that negligent misrepresentations 'estop' sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful." *Cerasoli v. Xomed, Inc.,* 47 F.Supp.2d 401, 411 (W.D.N.Y.1999)(*citing Decatur Mem'l Hosp. v. Connecticut Gen. Life Ins. Co.,* 990 F.2d 925, 926–27 (7th Cir.1993)(internal quotation marks omitted)); *see also, Coker v. Trans World Airlines, Inc.,* 165 F.3d 579, 585–86 (7th Cir.1999)(dismissing purported ERISA claim for estoppel based upon negligent misrepresentation); *see also, Gramm v. Bell Atlantic Mgt.,* 983 F.Supp. 585, 592 ( D.N.J.1997)(dismissing plaintiff's equitable estoppel claim where the miscalculation of the plaintiff's benefit was a "simple, albeit unfortunate mistake, which is devoid of any 'extraordinary circumstances' ").

Even assuming, arguendo, that the plaintiffs had demonstrated extraordinary circumstances, the Court finds that they could not satisfy all of the other elements of an equitable estoppel claim. Specifically, the Court finds that the plain-

tiffs cannot demonstrate that they reasonably relied on the inaccurate estimates, that they were injured thereby, or that injustice would result. It is undisputed that before any of the plaintiffs actually retired, they were notified of the error and given the option of being placed in the same position that they had been in prior to the VRP. However, for different reasons, all of the plaintiffs rejected this opportunity. At least one of the plaintiffs had decided to retire even before the VRP was announced. Several of the plaintiffs knew or had a strong suspicion that their positions were going to be eliminated in the near future, and therefore the VRP was still advantageous to them, even with the lowered benefit estimates. Several other plaintiffs' went forward with the VRP after learning the true figures not because of detrimental reliance, but because they had feelings of resentment and mistrust toward Chase. However, none of the plaintiffs demonstrated that they had taken any steps in reliance upon the erroneous estimates which would have prevented them from revoking their VRP acceptances. Accordingly, based upon all of the foregoing, the Court finds that the plaintiffs' claim for equitable estoppel must be dismissed.

### III. Claim For Equitable Relief Under 29 U.S.C. § 1132(a)(3)

■ The plaintiffs' fourth and fifth causes of action are pursuant to 29 U.S.C. § 1132(a)(3), which states, in relevant part, that

[a] civil action may be brought—

&ast; &ast; &ast; &ast; &ast; &ast;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

The plaintiffs contend that they are entitled to relief under this section because the defendants have breached their fiduciary duty, in violation of 29 U.S.C. § 1104(a)(1), which states, in relevant part, that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Plaintiffs contend that defendants breached their fiduciary duties in two respects. Relying upon *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the plaintiffs contend that the defendants intentionally lied to them regarding the amounts of their estimated pension benefits, in order to induce them to take early retirement. They further contend that Farrell breached his fiduciary duties when, after discovery of the error, he extended the deadlines for acceptance and revocation of the VRP. The Court disagrees.

First, the plaintiffs' seek the same relief under their fifth cause of action as they do under their first two, which is payment of the amounts erroneously stated in the benefit estimates, consequential damages "for, among other things, having to borrow or use personal funds to recoup losses created by the denial of their rightful, due and owing pension benefits," and "compensatory damages for emotional distress and mental anguish."(Plaintiffs' Amended Complaint, Ulterino Affidavit [# 38], Exhibit 1, pp. 23–29). However, this does not constitute "appropriate equitable relief" that may be obtained under 29 U.S.C. § 1132(a)(3). In *Varity*, the Supreme

Court discussed the possibility that a plaintiff might attempt to "repackage his or her 'denial of benefits' claim as a claim for 'breach of fiduciary duty'," and that lawyers might "complicate ordinary benefit claims by dressing them up in 'fiduciary duty' clothing." *Varity*, 516 U.S. at 513–14, 116 S.Ct. 1065. The Supreme Court stated that courts should prevent plaintiffs from having two bites at the apple in this fashion, and that "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515, 116 S.Ct. 1065. The Court interprets this to mean that plaintiffs may not seek the same relief under 29 U.S.C. § 1132(a)(3) as they are seeking under 29 U.S.C. § 1132(a)(1)(B). Since that is exactly what the plaintiffs here are attempting, the Court finds that their claim for breach of fiduciary duty is precluded. *See, Joyce v. Curtiss–Wright Corp.*, 992 F.Supp. 259, 270–71 (W.D.N.Y.1997).

▬▬▬▬ Second, even assuming, arguendo, that the plaintiffs could properly proceed under 29 U.S.C. § 1132(a)(3), the Court finds that Chase was not acting as a fiduciary when it prepared and issued the benefit estimates. "[A] person is a fiduciary with respect to a plan, and therefore subject to ERISA fiduciary duties, to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan." *Varity*, 516 U.S. at 498, 116 S.Ct. 1065. (internal quotation marks omitted). Moreover, "[i]n order to establish a claim for breach of fiduciary duty under ERISA, the plaintiff must establish that the defendant is a fiduciary with respect to the particular activity at issue in the action." *Devlin v. Transportation Communications Int'l Union*, No. 95 Civ. 0742(JFK), 1997 WL 570512, *9 (S.D.N.Y. Sep.15, 1997), *recons. denied*, 95 Civ.

10838(JFK), 1998 WL 37545 (S.D.N.Y. Jan. 29, 1998), *aff'd in part, vacated in part, remanded by* 173 F.3d 94 (2d Cir. 1999). However, the figuring of the plaintiffs' ERISA benefit estimates pursuant to the terms of the plan was a mathematical calculation that did not require the exercise of discretion. *See, MacMillan v. Provident Mutual Life Ins. Co. of Philadelphia*, 32 F.Supp.2d 600 at 605-07 (W.D.N.Y.1999)(holding that any discretionary authority granted to a plan administrator "is limited to discretion to determine eligibility for benefits, and does not extend to the calculation of the amount of benefits."); *see also*, 29 C.F.R. § 2509.75–8 D–2, FR–11 (stating that "[c]alculation of benefits" is a "purely ministerial" function); *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 21 (2d Cir.1996)(noting that the calculation of benefits is a ministerial function which does not require the exercise of discretion). The calculation of the erroneous benefit estimates was a purely ministerial act, which required no exercise of discretion. Accordingly, Chase was not acting as a fiduciary when it prepared and distributed the benefit estimates.

▬▬▬ Third, even assuming arguendo that Chase was acting in a fiduciary capacity when it prepared and distributed the benefit estimates, the record does not support a finding that Chase breached a fiduciary duty. The leading case on this issue is *Varity*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130. In *Varity*, an employer deliberately misled certain of its employees into believing that their benefits would be secure if they voluntarily transferred to a newly-created subsidiary corporation, when in fact, the employer had every reason to believe that the subsidiary would fail. *Id* at 493, 116 S.Ct. 1065. In short, the employer transferred its poorly-performing divisions, as well as various debts, to the new subsidiary. By doing so, the employer hoped that when the subsidiary failed, it would eliminate the poorly-performing divisions, eradicate the aforemen-

tioned debts, and relieve the employer of having to pay benefits to the employees who were misled in joining the new subsidiary. *Id.* In order to persuade employees to join the doomed subsidiary, the employer held a special meeting with employees, at which the employer assured employees that the subsidiary had a "bright future," and that their benefits would remain secure if they transferred. *Id.* at 501, 116 S.Ct. 1065. The employer was able to persuade 1,500 employees to transfer. In addition, the employer transferred the benefit obligations of 4,000 retired employees to the newly-created subsidiary, without those employees' knowledge or permission. The subsidiary promptly failed, and the employees lost their non-pension benefits. *Id.* at 494, 116 S.Ct. 1065. In finding that the defendants had breached their fiduciary duty under ERISA, the Supreme Court stated, in relevant part that "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense, is not to act solely in the interest of the participants and beneficiaries. As other courts have held, lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in ... ERISA." *Id.* at 506, 116 S.Ct. 1065 (citations and internal quotations omitted).

In the instant case, the plaintiffs' theory is consistent with the facts of *Varity,* in that they allege that Chase intentionally lied to them in order to induce them to take early retirement.[9] However, as noted above, the record simply does not support this theory. It is clear that the error in the benefit calculations was unintentional and came only as the result of McBride's error in creating the computer program, and in McBride's and McEachen's failure to identify the error through proper testing. However, even if McBride and McEachen were at fault, that does not

support a breach of fiduciary duty. The regulations interpreting ERISA state that

> [a] plan fiduciary may rely on information, data, statistics or analyses furnished by persons performing ministerial functions for the plan, provided that he has exercised prudence in the selection and retention of such persons. The plan fiduciary will be deemed to have acted prudently in such selection and retention if, in the exercise of ordinary care in such situation, he has no reason to doubt the competence, integrity or responsibility of such persons.

29 C.F.R. § 2509.75–8 FR–11. As noted above, the plaintiffs admit that McBride's employer, Buck, is "one of the largest and most reputable actuarial firms in the country." (Plaintiffs' Memorandum of Law [# 43], p. 21). And while the plaintiffs assert that McEachen was not qualified for the task she was given, they have not adduced any evidence to support that assertion or any evidence tending to show that Chase failed to exercise ordinary care in hiring and retaining McEachen. Therefore, under the regulations, the defendants were entitled to rely upon McBride's and McEachen's calculations, and the fact that some of the calculations turned out to be inaccurate does not establish that the defendants breached a fiduciary duty. Since there is no evidence that Chase actively or knowingly misled the plaintiffs, or acted with bad faith, the plaintiffs' claims under *Varity* must be dismissed. *See, Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d 790, 795, n. 5 (1st Cir.1995)(Noting that there was no breach of fiduciary duty where employer initially gave employee incorrect early retirement benefit figures, the employee elected to take early retirement, then five months later the employer discovered the error and gave the employee the corrected figures and further gave the employee the option of returning to status quo ante); *Easa v. Florists' Transworld*

---

9. Plaintiffs' Memorandum of Law states, in relevant part: "If the issue was simply a matter of miscalculation, there might be a question of law. Under the uncontroverted

facts here, however, to not recognize the Defendants' deception would ignore the fiduciary duty under ERISA." ( [# 43], p. 27).

*Delivery Assoc.,* 5 F.Supp.2d 522, 524 (E.D.Mich.1998)(holding that employer did not breach fiduciary duty where it accidentally conveyed incorrect retirement benefit estimates to an employee, who relied upon the erroneous figures in deciding to take early retirement); *Gramm,* 983 F.Supp. at 593 (holding that "a mistake in calculating pension benefits does not constitute willful misconduct or bad faith sufficient to support a breach of fiduciary duty claim" under ERISA); *Kuehl v. Chrysler Pension Plan,* 895 F.Supp. 1147, 1155 (E.D.Wis.1995)(holding that employer did not breach fiduciary duty under ERISA when it gave employee incorrect retirement benefit figure, where there was no evidence of willful or bad faith conduct).

■ Finally, the Court finds that Farrell did not breach a fiduciary duty when he extended the deadlines for acceptance and revocation of the VRP. The plaintiffs contend, in relevant part:

> For the VRP Plan changes, Defendant followed Plan procedure by granting Farrell the authority to amend the Plan, **but only to the extent specifically allowed under the Board resolution.** The Board Resolution, in turn, specifically set the window period from October 28 to December 12, 1994. Farrell's attempt to extend the election period until December 19 by virtue of his "Dear Colleague" memo of December 8th was completely and totally ineffective as it was clearly outside the scope of his fiduciary authority under the specific terms of the plan.

(Plaintiffs' Memorandum of Law [# 43], p. 30)(emphasis in original). Actually, the Board's Resolution does not specifically set the window period, but rather, it states in general terms that it approves the recommendation to offer a voluntary retirement program. (Ulterino Affidavit [# 38], Exhibit 11). As noted above, Farrell's recommendation memo does set forth the details of the proposed VRP, and proposes that "[t]he program will be available for acceptance only during the 'window' period

beginning on October 28, 1994 and ending on December 12, 1994," because "[l]egal and competitive review indicates that this is a reasonable time period."(Ulterino Affidavit [# 38], Exhibit 9, pp. 6437, 6807). In addition to approving Farrell's recommendation, however, the Board Resolution states, in relevant part:

> RESOLVED, ... that the Executive Vice President and Human Resources Executive of this Bank [Farrell] and such other officers as he shall designate be, and each of them hereby is, authorized and directed to adopt such specific amendments to the Retirement Plan ... to the extent necessary to conform to the amendments to the Retirement Plan authorized by this resolution, *as in their judgment shall be necessary or appropriate to carry out such recommendation.*
>
> \*　\*　\*　\*　\*　\*
>
> RESOLVED, that the officers of this Bank be, and each of them hereby is, authorized, in the name and on behalf of this Bank, to perform all such further acts, and to execute and deliver all such further agreements or other writings, *as they may deem advisable in order to carry out the intent of the foregoing resolutions.*

(Ulterino Affidavit [# 38], Exhibit 11)(emphasis added). The plaintiffs' argument here is essentially that the Board's resolution did not authorize Farrell to extend the deadline, however, the Court disagrees. It appears clear from Farrell's memo to the Board of Directors that the particular window period was chosen because it was deemed to be "reasonable." There was no other special significance about those dates, accordingly, there would be no reason why those dates could not be extended for a reasonable period in order to give the employees who had received erroneous estimates additional time to make their decision. Moreover, the resolution specifically gives Farrell authority and discretion to carry out his recommendation and to adopt the necessary amendments to the plan.

Section 13.7 of the Chase Plan states, in relevant part, that

> [t]he Board of Directors *and the authorized officers of the Bank* retain the authority to amend the Retirement Plan, subject to the power of amendment vested in the Named Fiduciaries hereunder; provided that any proposed amendment by the Board of Directors or any such officer shall be submitted to the Named Fiduciaries for their recommendations prior to its enactment by the Board *or any such officer.*[10]

(Ulterino Affidavit [# 38], Exhibit 3, p. 114). There is nothing in the record to indicate that this procedure was not followed prior to the adoption of the October 17, 1994 Board Resolution or the November 1996 adoption of Appendix XIII.[11] Moreover, contrary to the plaintiffs' assertions, it was not Farrell's December 8, 1994 memo which amended the plan, but rather, the Adoption of Appendix XIII, which approved the extension retroactively. Accordingly, the Court rejects the plaintiffs' contention that Farrell's extension of the deadlines was unauthorized.

▆▆ The plaintiffs also contend, relying upon *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.1982), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), that Farrell and McEachen breached a fiduciary duty when they "caused the Plan to act in a way that benefitted the corporation, and not the Plaintiffs as participants, when first failing to test (or improperly testing) the VRP formula, then by concealing the problems even after having actual notice of the mistakes." (Plaintiffs' Memorandum of Law [# 43], p. 32). The *Donovan* case

states, in relevant part, that officers of a corporation who are also trustees of the corporation's pension plan must "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Id.* at 271. As noted earlier, McEachen is not a fiduciary under this plan, nor is she an officer of Chase. Moreover, the record demonstrates that Chase did notify the plaintiffs of the error, even if it was not as quickly as the plaintiffs would have liked. The record also demonstrates that Farrell acted in the plaintiffs' best interests when he extended the deadlines for acceptance and revocation of the VRP. The plaintiffs argument to the contrary does not make sense, because if, as the plaintiffs seem to believe, Chase intentionally misled them with erroneously high benefit estimates in order to induce as many of them as possible to take early retirement, then clearly they believe that it was in Chase's best interests to have as many of them as possible take early retirement. However, by extending the deadline for acceptance and revocation, Farrell would have been acting contrary to Chase's interests, because he allowed employees who had already elected to retire an opportunity to revoke and return to work. Obviously, the plaintiffs attack Farrell's extension of the deadlines to strengthen their position in this action. If the plaintiffs had not been given additional time to make their decision, and if those plaintiffs who had already elected to retire in reliance upon the erroneous estimates

---

10. The plaintiffs state, incorrectly, that "[c]learly, the Defendants here have authorized only the Named Fiduciaries (Plan Section 13.3) to implement plan changes." As Plan Section 13.7 makes clear, the Bank's Board of Directors and authorized officers have the primary authority to amend the plan, subject only to the limited power of amendment vested in the Named Fiduciaries by Section 13.5, which is not relevant to this action.

11. In an apparent attempt to demonstrate that the Named Fiduciaries were not consulted prior to Farrell's amendment of the plan, the plaintiffs state that it was not until Walczak's appeal that the named fiduciaries became aware of the extension of the deadlines. (Dolin Affidavit [# 42], p. 55, n. 107, n. 108). However, the plan was not formally amended until the adoption of Appendix XIII in November of 1996, and the plaintiffs have presented no evidence that the defendants failed to comply with Plan Section 13.7 at that time.

had not been given additional time to revoke, the plaintiffs would be in ·a much better position to argue for estoppel or breach ,of fiduciary duty. Conversely, the extension of the deadlines all but eviscerates the plaintiffs' theory of the case. In any event, based upon all of the foregoing, the Court finds that the plaintiffs have failed .to establish that Farrell or anyone else at Chase breached a fiduciary duty.[12]

## CONCLUSION

Based upon the foregoing, the plaintiffs' cross-motion for summary judgment [# 42] is denied in all respects. The defendants' motion for summary judgment [# 33] is granted in its entirety, and the plaintiffs' amended complaint is dismissed, with prejudice.

So ordered.

---

12. The plaintiffs have also sued the named fiduciaries of the plan, Shinn, Field, and Riordan. However, they have come forward with no evidentiary proof in admissible form that these three had any involvement in the distribution of the erroneous benefit estimates, or in the extension of the deadlines for acceptance and revocation. Accordingly, the claims against the named fiduciaries must also be dismissed.