**Linda DEL GRECO, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**CVS CORPORATION d/b/a/ PharmaCare Management Services, Defendant.**

**No. 03 CIV.1262 CM LMS.**

United States District Court, S.D. New York.

Sept. 22, 2004.

William Robert Weinstein, Wechsler Harwood LLP, New York, NY, for Plaintiff.

Gina Desantis Wodarski, Paul E. Dwyer, Edwards & Angell, LLP, Providence, RI, Mark S. Landman, Landman, Corsi, Ballaine & Ford, P.C., New York, NY, for Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Defendant CVS Corporation, doing business as PharmaCare Management Services ("PharmaCare"), moves to dismiss the complaint of Plaintiff Linda Del Greco ("Del Greco"), either pursuant to Fed. R.Civ.P. 12(b)(6) or on motion for summary judgment pursuant to Fed.R.Civ.P. 56. After reviewing the motion papers, I conclude that Defendant is entitled to summary judgment dismissing the complaint. Accordingly, I grant the motion.

## FACTS

### I. The Complaint

Plaintiff Del Greco is an ERISA beneficiary under a Prescription Drug Plan administered by Defendant on behalf of her husband's former employer, North Shore–Long Island Jewish Health System. She was prescribed the drug tamoxifen citrate by her physician. Tamoxifen citrate is a prescription drug that interferes with the effects of the body's estrogen on breast cancer cell growth. As a treatment for breast cancer, the drug slows or stops the growth of cancer cells already present in the body. Tamoxifen citrate has also been shown to prevent the recurrence of breast cancer and the development of new cancers. In 1998, tamoxifen citrate was approved by the Food & Drug Administra-

tion ("FDA") to reduce the incidence of breast cancer in women at high risk for developing the disease. (Cmplt.¶ 23).

Plaintiff generally alleges that she and other similarly situated women who were beneficiaries of prescription drug plans administered by Defendant during the period beginning October 4, 1996 and continuing to the date of the complaint, February 25, 2003 (the "Class Period"), were wrongfully required to pay "brand-name" rather than "generic" co-payments for their tamoxifen citrate prescriptions in violation of 29 U.S.C. § 1001 (ERISA) and the duties imposed on defendant thereunder. Typically, prescription drug plans like Plaintiff's provide for a lower co-payment for generic drugs than for so-called "branded" drugs. Plaintiff contends that the tamoxifen citrate she and other members of the class purchased—which was manufactured by Barr Laboratories—was "generic" tamoxifen citrate rather than "branded" tamoxifen citrate.

## II. The Undisputed Facts

The following facts, as derived from the parties' Rule 56.1 Statements, are either undisputed or viewed most favorably toward Plaintiff:

1. Tamoxifen citrate is a prescription drug that was approved by the FDA to treat breast cancer. *See* Cmplt. at ¶ 23. Defendant maintains that, AstraZeneca, the innovator of tamoxifen citrate, sells its product under the name Nolvadex®. At the end of 2002 and early 2003, however, AstraZeneca sold tamoxifen citrate to Plaintiff under the name Tamoxifen Citrate ("Tamoxifen"), as well as under the brand-name Nolvadex®. A patent protected AstraZeneca's tamoxifen citrate until 2002.[1] *Id.*

2. In 1987, Barr Laboratories ("Barr") filed an Abbreviated New Drug Application ("ANDA") with the FDA challenging the validity of the patent held by the parent/affiliate of AstraZeneca at that time, Imperial Chemical Industries ("ICI"). *Id.* at ¶ 24. On March 5, 1993, while the parties' patent action was pending in federal court, the parties entered into a settlement agreement. *Id.* Pursuant to that settlement agreement, ICI/AstraZeneca gave Barr the exclusive right to distribute and sell Tamoxifen, while Barr agreed not to pursue efforts to obtain FDA approval of its own generic version of tamoxifen prior to the expiration of the ICI/AstraZeneca's tamoxifen patent in August of 2002. *See* Distribution and Supply Agreement, dated March 5, 1993, Plf. Ex. 17; Letter from A. Sage Middlesworth to Gretchen Keach, dated October 9, 1996, Def. Ex. B. "Barr subsequently amended its ANDA to eliminate the patent validity challenge, thus delaying approval of its ANDA until the 2002 expiration of [ICI's/AstraZenica's] tamoxifen patent ..." Cmplt. at ¶ 24.

3. After the AstraZeneca/Barr settlement, on January 1, 1998, PharmaCare, a wholly-owned subsidiary of CVS, entered into an agreement (the "Agreement") with North Shore Long–Island Jewish Health System ("North Shore"), whereby PharmaCare provided services in connection with North Shore's self-insured, prescription drug plan (the "Plan"). Under its Agreement with PharmaCare, North Shore specified, amongst other terms, the classes of members, benefits and prescription drugs covered by the Plan, and exclusions and deductibles or co-payments applicable to the Plan. Def. Ex. C at pp. 16–

---

1. For purposes of this decision, "tamoxifen citrate" and "tamoxifen" refer generally to the compound which is the subject of the AstraZeneca patent. The term "Tamoxifen," with a capital "T," refers specifically to the tamoxifen citrate manufactured by AstraZeneca for distribution and sale by Barr, sometimes referred to as "Barr's Tamoxifen."

17, ¶ I(f)(3). Specifically, North Shore provided PharmaCare with "information concerning the Plan," including but not limited to "parameters for determining whether, and to what extent, benefits are covered by the Plan; what, if any, exclusions apply; and the amounts of all payments as well as the compensation rates to be offered for each benefit." *Id.* at p. 2, ¶ I(a).

4. Under the Agreement, PharmaCare, as Claims Administrator for the North Shore Plan, "ha[d] the discretionary authority and responsibility to interpret, construe and make determination under the applicable coverage option." Def. Ex. D at p. 74. The Agreement required PharmaCare to "maintain a plan-specific NDC (National Drug Code) file for prescription drugs ... [and] update the NDC file weekly from information provided by Medi–Span Corporation's [database]." Def. Ex. C at p. 16, ¶ I(f)(3). Medi–Span Corporation, Inc. ("Medi–Span") is one of the two credible "sources of master drug databases that most people use for adjudication in some of their clinical modules." Deposition of Gary Shramek ("Shramek Dep.") at pp. 267–68, 273–74, Def. Ex. O. However, the Agreement also required PharmaCare to

consult with outside software and other vendors [including and in addition to Medi–Span], as well as consulting health care professionals and any recognized compendia to provide databases and other information as PharmaCare deems necessary and helpful to include in the clinical database [and to] endeavor to update the clinical database on a reasonable basis.

Def. Ex. C at 20. Finally, in the contract between PharmaCare and Medi–Span concerning the pharmaceutical database,

Medi–Span specifically disclaims "the accuracy of codes, prices, or other data," and further warns that "[t]he clinical information contained in the DATABASES is intended as a supplement to, and not a substitute for, the knowledge, expertise, skill and judgment of physicians, pharmacists and other health care professionals in patient care." Plf. Ex. 3.

5. Medi–Span originally classified Barr's Tamoxifen as a "brand," but changed the classification to "generic" in January 1994 at the request of Barr. In 1995, Barr requested that it be re-classified as a "brand." *Id.* The reasons for these changes are reflected in a Memorandum from a Customer Support Specialist at Medi–Span to Rich Mercure at Pharma-Care (the "Mercure Memo"),[2] which states, in relevant part:

To: RICH MERCURE
 PHARMACARE # 200382

From: JANET M.
 [Medi–Span] CUSTOMER SUPPORT SPECIALIST

RE: TAMOXIFEN CITRATE

Q: Regarding Tamoxifen Citrate, there is only 1 labler that supplies Tamoxifen Citrate ... Zeneca. Zeneca has a contract w/ Barr and send the same pills they [Zeneca] package to Barr for repackaging under (Nolvadex b). Same pill that Zeneca uses, even has Zeneca's signia on it, but Barr said they wouldn't represent it as a Generic. We list Tamoxifen Citrate (Barr) as being considered a Brand Item at this time.

Can we explain.

A: This product [Barr's Tamoxifen] is manufactured by Zeneca and sold under the Brand Name Nolvadex. It is under patent until 2002. There is an agree-

---

2. The Mercure Memo is not dated, however a comment within the memo suggests that it was written February 3, 1995: "We will be changing for the EOM (end of month) file

(this memo dated 2/3/95), the Gen-code to "M" for Nolvadex and Tamoxifen for those GPI's which have both brands available" (emphasis added).

ment between Zeneca and Barr Labs to market the price. This is not a true co-licensed agreement but very similar. We had originally assigned both products the same Gen-code, (M) with different Brand-codes (T and G). Back in January '94, we were questioned on whether the Barr brand was a generic product or not, and in following up with Barr, were informed that they were marketing the products as a generic version and that we should be using a "G" Gen-code. The change was made in our files, and now Barr is getting complaints about lower reimbursement rates for their product by pharmacies. They have requested that we change the Gen-code back to an "M" (co-licensed). In view of the long time before the patent expires (7 years), we are in agreement that this product is for practical purposes a co-licensed product, even though the Barr brand is sold under the generic name. We will be changing for the EOM (end of month) file (this memo dated 2/3/95), the Gen-code to "M" for Nolvadex and Tamoxifen for those GPI's which have both brands available.

Def. Ex. N.

6. On October 9, 1996, A. Sage Middlesworth, Regulatory Affairs Associate for Barr Laboratories, Inc. sent a letter to Gretchen Keach (whose affiliation is not made clear by either party), stating the following:

Gretchen Keach

25 Blackstone Valley Place

Lincoln, RI 0286

Fax 401–334–4995

Dear Ms. Keach:

This letter is in reference to your recent phone call. You had asked for clarification regarding the brand/generic status of our product, Tamoxifen 10mg tablets. We appreciate your interest in this matter.

We have an agreement with the innovator, who also manufactures and distributes the brand name product, that allows us to distribute tamoxifen citrate under our own label. In accordance with this agreement, the innovator manufactures Barr's Tamoxifen Citrate under the same drug application as its own product. The innovator has patents protecting tamoxifen which remain enforceable, preventing other manufacturers from producing the product. It is therefore a single source drug product. Through this agreement, we are able to market this product under its generic name (tamoxifen citrate) and provide it at a lower cost to our customers. However, because it is manufactured by the same company who manufactures the branded product, Barr's Tamoxifen Citrate is identical to, except for tablet markings, the innovator's brand name product. In other words, although having some of the attributes of a generic drug, this is not a true 'generic.'

I hope this is sufficient to answer any questions that you may have regarding Barr's Tamoxifen Citrate . . .

Regards,

/s/

A. Sage Middlesworth, R.Ph.

Regulatory Affairs Associate, Regulatory Affairs & Compliance

Barr Laboratories, Inc.

Def. Ex. B.

7. In or about March of 2003, Medi–Span again changed the designation of Tamoxifen to " 'generic product' with the introduction of FDA approved generic products for Tamoxifen." Def. Ex. E.[3]

---

**3.** The declaration in which this comment appears notes that the reclassification was spurred by the "introduction" of "generic products for Tamoxifen" in 2003, suggesting that Barr's Tamoxifen was the only non-Nolvadex® version of tamoxifen available prior to that time. Declaration of Nina LaCroix,

8. During the Class Period, the FDA's list of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book," did not list any generic version of tamoxifen. *See* FDA Orange Book, Def. Ex. F.

9. PharmaCare maintained North Shore's member, group, physician, pharmacy and Plan files in its computer system for efficient claims processing. Def. Ex. C at pp. 4, 16; Cmplt. at ¶¶ 17–19. PharmaCare processed claims via its North Shore computer database, and conveyed the results of the processed claims, including eligibility determinations and required copayments, to the pharmacy filling North Shore Plan members' prescriptions. *Id.*

10. North Shore provided all of its employees with a copy of its Flex Benefits Program Summary Plan Description ("SPD"), which contained its prescription drug benefits program. Cmplt. at ¶ 22; Def. Ex. D. Under the SPD, the co-payment for up to a thirty-day supply of a prescribed drug filled at a retail pharmacy was $7 for generic drugs and $16 for brand-name drugs; the co-payment for up to a ninety-day supply of a prescribed drug filled by PharmaCare under its mail order program was $10 for generic drugs and $25 for brand-name drugs. Cmplt. at ¶ 22. The SPD also set forth "Claim Procedures," which mandate that "prescription drug claims must be filed within 12 months after you fill the prescription." Def. Ex. D at p. 43. "To file a prescription drug claim, you must complete and file a PharmaCare Prescription Drug Claim Form, along with supporting documents, to PharmaCare ..." *Id.* "If your claim is denied, in whole or in part, you can request a review of your denied claim .... A complete explanation of the procedure for appealing a claim can be found in the

'ERISA Information' section of the [SPD]." *Id.*

11. The ERISA Information section of North Shore's SPD set forth further Claims Review Procedures which state, amongst other information, that: (1) a claimant must file a written claim for benefits on the appropriate form, which is available in Corporate Benefits; (2) the claimant will receive a written response within 90 or 180 days of the filing of the claim for benefits; (3) the claimant may request a review of the denial of her claim, but her request must be in writing and made within 60 days of receipt of the written claim denial; and (4) the claimant will receive a written notification of the outcome of her claim for benefits within 60 or 120 days of her request for a review of the denial of her claim. Def. Ex. D at p. 75. Importantly, the SPD states that "*[n]o legal action or suit to recover benefits may be started before exhaustion of the pre-authorization/claims review procedure ...*" *Id.* (emphasis added).

12. Plaintiff filled five prescriptions for tamoxifen citrate in 2001. For the first two, which were not administered by PharmaCare, Plaintiff was charged only a $5 generic co-payment even though the prescriptions were filled with Nolvadex®. Plaintiff used the PharmaCare mail order pharmacy to fill the next three ninety-day Tamoxifen prescriptions during calendar year 2001, and was required to remit a co-payment of $25 for a branded drug in connection with each such prescription. Cmplt. at ¶ 25. Plaintiff did not submit a written prescription drug claim to PharmaCare at any time. Cmplt. at ¶¶ 23–27.

13. On October 4, 2004, Plaintiff commenced an action against PharmaCare in New York State Supreme Court, but it

Director of Claims Operations for PharmaCare, Def. Ex. E. Thus, the reclassification to

generic would appear to apply to Barr's Tamoxifen specifically.

was voluntarily discontinued in February 2003 pursuant to a stipulation between the parties (the "Stipulation"). Plf. Ex. 10.

14. On or about February 25, 2003, pursuant to the Stipulation, Plaintiff filed a civil Complaint against PharmaCare under 29 U.S.C. § 1132(a)(1)(B) and (a)(3), alleging that PharmaCare's actions violated the Employment Retirement Income Security Act ("ERISA"). Def. Ex. A. In support of her Complaint, plaintiff refers to Barr's June 30, 2000 Securities and Exchange Commission ("SEC") Form 10–K Report ("Report"), a purported Barr Press Release, and a New York Board of Pharmacy List. Cmplt. at ¶¶ 29, 32; Def. Ex. G (Barr's Annual Report on Form 10–K, filed with the Securities and Exchange Commission for the period ending June 30, 2000, and containing the following statement: "Among the Company's key generic products are: ONCOLOGY: Tamoxifen Citrate.....The Company's largest selling product is Tamoxifen Citrate ("Tamoxifen"), the generic version of Nolvadex (R)"); Def. Ex. H (purported Barr press release from December 1998 stating that its settlement with AstraZeneca "has resulted in millions of dollars of savings to consumers since the Company began distributing a generic version of this breast cancer therapy in 1994"); Def. Ex. I (New York Board of Pharmacy list of the 150 most-prescribed drugs, prepared pursuant to New York Education Law, Article 137, § 6826 which lists "all generic drug names" in italics, and which lists *"TAMOXIFEN CITRATE"* in italics).

15. On April 4, 2003, Defendant filed a motion to dismiss Plaintiff's complaint or, in the alternative, a motion for summary judgment. On September 22, 2003, the Court issued a decision and order granting Defendant's motion for summary judgment based on Plaintiff's failure to timely respond to Defendant's motion. On October 6, 2003, I issued an Order Granting Plain-

tiff's Motion for Relief From Judgment, recalling my decision of September 22, 2003 and setting a new motion and discovery schedule.

## DISCUSSION

### I. Standard of Review

Under Fed.R.Civ.P. 56(c), a party is entitled to summary judgment if the moving party establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court will "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotations omitted).

### II. Defendant's Procedural Arguments in Favor of Dismissal

Defendant puts forth essentially three arguments in favor of dismissal of Plaintiff's claims. First, Defendant argues that both of Plaintiff's claims must be dismissed because she has failed to exhaust her administrative appeals under North Shore's SPD. Second, Defendant argues that Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim must be separately dismissed because she has sued the wrong party. Finally, Defendant argues that Plaintiff's 29 U.S.C. § 1132(a)(3) claim must be dismissed be-

cause Defendant it is not a fiduciary with respect to tamoxifen benefits.

Plaintiff counters that (1) the exhaustion requirement should not apply to Plaintiff's claims because her suit is not based on a claim for the denial of benefits; and (2) even if she did not satisfy the exhaustion requirement, exhaustion would be futile because (2)(a) Defendant has, in its brief, denied Plaintiff's entitlement to the benefits she seeks, and (2)(b) the issue of whether the tamoxifen received by Plaintiff was a "generic" or "brand-name" drug is an issue of law for the courts, not an administrator.

For the following reasons, Defendant's motion to dismiss is granted.

### A. *Defendant's Motion To Dismiss Plaintiff's First Cause of Action Under 29 U.S.C. § 1132(a)(1)(B) Cause of Action For Failure To Exhaust Administrative Remedies Is Granted*

 Any ERISA plan participant or beneficiary is empowered to bring a civil action "to recover benefits due to him under the terms of his plan, enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Nevertheless, courts have routinely held that an ERISA plaintiff must exhaust a plan's administrative procedures prior to filing suit for the recovery of benefits in federal court. *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir.1989) (noting requirement that ERISA claimants exhaust remedies provided for by their plan). An exception to the exhaustion requirement exists, however, where a claimant has made a showing that exhaustion would be futile. *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588 (2d Cir.1993).

Plaintiff alleges that she need not have exhausted her administrative remedies under ERISA because "the issues raised by plaintiff's claims involve neither a formal written claim nor claim denial," *see* Plf. Opp. at p. 8, and because "the exhaustion requirement is inapplicable to a statutory claim under ERISA." *Id.* at 10, n. 6. First, Plaintiff refers to her own claim as one for denial of benefits in the Complaint: "PharmaCare's classification of tamoxifen as a brand-name drug rather than a generic drug... deprived plaintiff and the Class of the benefit of the lesser co-payment for generic drugs to which they are entitled..." Cmplt. at ¶ 44. Second, Plaintiff is incorrect insofar as she argues that her recovery of benefits claim is excused from the exhaustion requirement on the grounds that North Shore's SPD does not specifically address the situation alleged to have occurred here—an overcharge based on the erroneous characterization of Plaintiff's tamoxifen prescriptions as "branded." I conclude that the exhaustion requirement does apply.

In a subsection entitled "Claims Review Procedure," the Plan states, "Except to the extent provided elsewhere in this booklet or in an insurance booklet, the following procedures apply to *all coverage options* available under [the benefits program]". *Id.* at p. 75 (emphasis added). The section continues, "The law provides that each plan subject to ERISA must set up reasonable rules for filing a claim for benefits. In general, [the participant] ... must file a written claim on the appropriate form. Claim forms are available in Corporate Benefits." *Id.* "If your claim is denied, either in full or in part, you may request a review of the denial. Your request for review must be in writing and must be made within 60 days of your receipt of the written claim denial." *Id.* The section concludes, "*No legal action or suit to recover benefits* may be started

*before exhaustion* of the pre-authorization/claims review procedure." *Id.* (emphasis added). Thus, the procedure for challenging coverage determinations is the same in all cases-and requires exhaustion in all cases.

Here, Plaintiff wants to have the advantage of a benefit due her under the Plan-a lower co-payment for the "generic" drug she was given by her pharmacist. By being forced to co-pay for a branded drug, she believes she was denied that benefit. In this case, "recovery" of the benefit would come in the form of a refund, because Plaintiff's claim is that she was denied a benefit by being forced to overpay for her share of the cost of Tamoxifen. But she still seeks to recover a benefit due under the Plan. Therefore, she must exhaust.

An analogous portion of the Plan describes what a beneficiary should do to recover any payment made for a prescription that was filled at a non-participating pharmacy. The portion of the Plan entitled "Prescription Drug Plan" provides, "If ... in an emergency situation you fill a prescription at a non-participating pharmacy, you should pay for the prescription and file a claim with PharmaCare." Def. Ex. D at p. 43. "To file a prescription drug claim, you (or your doctor) must complete and file a PharmaCare Prescription Drug Claim Form, along with other supporting documents ... within 12 months after you fill the prescription." *Id.* Finally, "If your claim is denied, in whole or in part, you can request a review of your denied claim." *Id.*

Plaintiff correctly points out that this portion of the Plan does not address what a participant should do if she is overcharged by a participating pharmacy. But the fact that the Plan does not specifically address the issue of overcharges at participating pharmacies is of no consequence. There is no material difference between the "recovery of benefits" sought by a participant in "an emergency situation," where a participant had filled a prescription at a non-participating pharmacy, and the "recovery of benefits" sought in Plaintiff's First Cause of action for the deprivation of "plaintiff and the Class of the *benefit* of the lesser co-payment for generic drugs to which they are entitled under their ERISA prescription drug plans." Cmplt. at ¶ 44 (emphasis added). Thus, the Plan, by its terms, did in fact require Del Greco to file a written claim for the recovery of any overcharges associated with her Tamoxifen prescriptions.

Plaintiff cites to *In re Blue Cross of Western Pa. Litig.*, 942 F.Supp. 1061, 1064 (W.D.Pa.1996) for the proposition that "a claim for enforcement of the terms of the [ ] plan[ ] and recovery of benefits due is not an appeal of a denial of benefits" and therefore "plaintiff[ ][is] not required to exhaust administrative remedies." Whatever may be the state of the law in the Third Circuit, that is not the law in this Circuit. Moreover, the Blue Cross opinion's distinction between "denial of benefits" and "enforcement of the terms of the plan" is illogical. In this case, the terms of the Plan entitle Del Greco to different levels of coverage, with different co-payments from her, for generic and branded drugs. By forcing Del Greco to pay the co-payment for a branded drug if she were in fact receiving a generic drug, PharmaCare would be denying her a benefit to which she is entitled under the Plan. Therefore, her claim is for denial of benefits: specifically, the benefit applicable to generic drugs.

■ As for plaintiff's futility argument: existing case law in this Circuit requires a participant to satisfy a Plan's administrative procedures in the first instance, including any time limitations on filing written benefits claims, before she can pursue

a claim of futility. *See Cappiello v. NYNEX Pension Plan,* No. 92 Civ. 3896, 1994 WL 30429, at *3–4 (S.D.N.Y. Feb.2, 1994) (noting that in order to exhaust the remedies provided by the plan at issue, it was necessary to file an initial application for benefits as well as a written request to appeal); *see also Barnett v. IBM Corp.,* 885 F.Supp. 581, 587–88, n. 7 (S.D.N.Y. 1995) (quoting *Tiger v. AT & T Technologies Plan for Employees' Pensions, Disability Benefits,* 633 F.Supp. 532, 534 (E.D.N.Y.1986)) ("the failure to comply with reasonable time constraints prescribed by the Plan's review procedure precludes judicial review of a claim for benefits"). As this court noted in *Barnett,* "the futility exception is applied in a context in which there has been, in some form, an unambiguous application for benefits and a formal or informal administrative decision denying benefits and it is clear that seeking further administrative review of the decision would be futile." *Barnett,* 885 F.Supp. at 588.

Because neither party disputes that Plaintiff submitted neither a written claim form nor a written request for review within the time period specified under the Plan, I am constrained to find that she has not satisfied the exhaustion requirements for her 29 U.S.C. § 1132(a)(1)(B) claim. *Id.* ("The purposes of the exhaustion doctrine would not be served by allowing the plaintiff the benefit of the futility exception ... [where she] has not shown that she ever made any effort to take any formal administrative action with respect to any claim for [ ] benefits of which she might have availed herself"). As a result, the fact that Defendant did not issue a formal or informal administrative decision denying recovery is of no moment.

Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim is therefore dismissed for failure to exhaust.[4]

### B. *Defendant's Motion to Dismiss Plaintiff's Second Cause of Action Under 29 U.S.C. § 1132(a)(3) As Duplicative Is Granted*

ERISA also allows a court to remedy a breach of fiduciary duty alleged by a plan participant, beneficiary or fiduciary by enjoining any act or practice that caused the breach or by providing "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). Under ERISA, a " 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." *Varity Corp. v. Howe,* 516 U.S. 489, 498, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)(quoting ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)(iii)); *see also Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 87–88 (2d Cir. 2001).

■ As a threshold matter, Defendant argues that Plaintiff's claim should be dismissed because Defendant is not a fiduciary of the Plan. I disagree.

Here, it is undisputed that Defendant is the named Claims Administrator, and the Plan specifically states,

The Plan Administrator, its delegate, the designated Claims Administrator or the insurance carrier, as the case may be, has the discretionary authority and responsibility to interpret, construe and make determinations under the applica-

---

4. Because I dismiss Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim for a failure to exhaust, I need not reach Defendant's alternative argument that it should be dismissed for failure to sue the proper party.

ble coverage option. All interpretations, constructions and determinations made by such parties shall be final and binding on all persons, unless found by a court of competent jurisdiction to be arbitrary and capricious.

Def. Ex. D at a 74. The decision whether to charge a beneficiary a generic or brand price under the Prescription Drug Plan is certainly a "determination under the applicable coverage option." And, while Defendant contends that it performed "purely ministerial functions" in "adopting" Medi–Span's designation of Tamoxifen as a brand drug, it is clear that Defendant consulted on and relied on a number of sources other than Medi–Span, which constitutes evidence that Defendant exercised at least *some* degree of independent judgment in determining how to classify Tamoxifen. (Plf. Ex. 12 at 303–04). Defendant is therefore not entitled to summary judgment on the grounds that Plaintiff is not a fiduciary under the Plan.

■ PharmaCare also contests the nature of the relief that Plaintiff seeks—arguing that "the gist of plaintiff's equitable claim is simply that she is entitled to benefits in the form of generic co-payments under the terms of the North Shore Plan". (Def. Mem. at p. 20). I agree with that argument.

■ The Supreme Court has held that § 1132(a)(3) only comes into play where other portions of ERISA's civil enforcement scheme do not provide a remedy for the beneficiary's injury. *Varity Corp. v. Howe*, 516 U.S. 489, 513–14, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (noting "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief [under § 1132(a)(3) ], in which case such relief normally would not be "appropriate" "). The Second Circuit, clarifying the Court's ruling in *Varity Corp.*, held that "*Varity*

*Corp.* did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available; instead the district court's remedy is limited to such equitable relief as is considered appropriate." *Devlin*, 274 F.3d at 89–90 (citing *Varity Corp.*, 516 U.S. at 512, 116 S.Ct. 1065). Thus, Plaintiff may bring a claim under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) only as long as she seeks equitable relief on her 29 U.S.C. § 1132(a)(3) claim. *Armstrong v. Liberty Mut. Life Assur. Co. of Boston*, 273 F.Supp.2d 395, 408 (S.D.N.Y.2003); *Primax Recoveries Inc. v. Carey*, 247 F.Supp.2d 337, 341 (S.D.N.Y.2002). The question before this Court, then, is whether the type of relief sought by Plaintiff is sufficiently "equitable" in nature to satisfy the requirements of § 1132(a)(3).

In *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), the Supreme Court ruled that the term "equitable relief," for the purposes of an ERISA action, must refer to "those categories of relief that were *typically* available in equity." *Hewitt Associates*, 508 U.S. at 256, 113 S.Ct. 2063. Thus, the Second Circuit has warned, "In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label." *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir.2003).

In this case, Plaintiff professes to seek several remedies other than recovery of benefits, which on their face appear to be equitable in nature. Specifically, Plaintiff seeks (1) a declaration that the Tamoxifen distributed by Barr Laboratories and AstraZeneca during the Class Period (beginning June 17, 1997 and continuing to the present) constitutes a "generic" drug as a matter of law; (2) a permanent injunction preventing PharmaCare from classifying Barr's Tamoxifen as a brand-name rather than a generic drug and requiring brand-

name co-payments; and (3) restitution and/or disgorgement of the amounts allegedly unjustly received by PharmaCare as a result of its misclassification of Tamoxifen.

Plaintiff can label these claims whatever she likes, but they merely duplicate her claim for a refund as pleaded in Count I.

As to Plaintiff's request for restitution, dismissal is compelled by the Supreme Court's decision in *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). There, the Court held that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214, 122 S.Ct. 708. This requires that the "money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession." *Id.* at 210, 122 S.Ct. 708. By contrast, "almost invariably ... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id.* at 210, 122 S.Ct. 708 (quoting *Bowen v. Massachusetts,* 487 U.S. 879, 918–919, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (Scalia, J., dissenting)) (internal quotation marks omitted).

Plaintiff's restitution claim duplicates her denial of benefits claim. Both her First and Second causes of action allege the same conduct (misclassification of Barr's Tamoxifen as a brand-name) and seek the same measure of relief (the difference between the co-payment Mrs. Del Greco paid and the co-payment she alleges she should have paid under the Plan benefit). Furthermore, even after Plaintiff was allowed additional discovery time, she has produced no evidence that Defendant actually retains the monies. *See Nechis v. Oxford Health Plans, Inc.,* 328 F.Supp.2d 469 (S.D.N.Y.2004) (dismissing restitution claim where monies could not be traced to a particular fund); *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 375 (S.D.N.Y. 2002) (same). Plaintiff's claim for restitution is therefore clearly contractual in nature, and is not recoverable.

Plaintiff cannot salvage her duplicative second cause of action by seeking "declaratory judgment" and "injunctive relief." The essence of Plaintiff's claim in this matter is that PharmaCare was responsible for incorrectly classifying Barr's Tamoxifen as a brand-name drug, rather than as a "generic." As a result of this classification, Plaintiff claims to have been forced into making higher "brand-name" co-payments for tamoxifen, even though she was prescribed and received the Barr version of the drug. Whether Plaintiff seeks to clothe this issue in the garb of "recovery of benefits" or "breach of fiduciary duty" does not change the fact that the relief sought—reimbursement for an overcharge under the Plan—is the same. *See Gerosa,* 329 F.3d at 321. "Such compensatory damages, even if they resulted from a breach of fiduciary duty, are not recoverable as equitable relief under § 1132(a)(3)." *Weinreb v. Hospital for Joint Diseases Orthopaedic Institute,* 285 F.Supp.2d 382, 388 (S.D.N.Y.2003); *see also Great–West Life,* 534 U.S. at 212–16, 122 S.Ct. 708; *De Pace v. Matsushita Elec. Corp. of America,* 257 F.Supp.2d 543, 560–65 (E.D.N.Y. 2003); *Bona v. Barasch,* No. 01 Civ. 2289, 2003 WL 1395932, at *10–12, (S.D.N.Y. Mar 20, 2003); *Kishter v. Principal Life Ins. Co.,* 186 F.Supp.2d 438, 444–45 (S.D.N.Y.2002); *Augienello v. Coast–to–Coast Fin. Corp.,* No. 01 Civ. 11608, 2002 WL 1822926, at *5–6 (S.D.N.Y.Aug.7, 2002).

For these reasons, Defendant's motion to dismiss Plaintiff's second cause of action for breach of fiduciary duty as redundant is also granted.[5]

I note that I did not dismiss the equitable claims as redundant in the related case of *Del Greco v. Medco Health Solutions, Inc.*, No. 03 Civ. 4374(CM)(GAY). At that time, however, Plaintiff had alleged that additional discovery would substantiate her claim that this was not a "traditional" denial of benefits case. I expressed grave doubts on that score at the time, but allowed her to proceed in that case. With the benefit of discovery, I find that my initial reservations were well-founded. This claim is no more than a traditional denial of benefits claim, and Plaintiff was required to exhaust her administrative remedies prior to bringing suit in federal court.

## III. Defendant's Substantive Arguments in Favor of Dismissal

Assuming *arguendo* that one or both of Plaintiff's claims are cognizable (either because she exhausted her first claim or because portions of her second claim are not duplicative of the unexhausted first claim), I must determine the appropriate standard for review of those claims and whether Defendant's determination that Barr's Tamoxifen is "brand-name" satisfies that standard. After carefully reviewing the record, I conclude that the correct standard to apply is the arbitrary and capricious standard, and that Pharma-Care's classification of Barr's Tamoxifen as a brand-name drug for co-payment purposes prior to the expiration of AstraZenica's patent was not arbitrary and capricious.

### A. *Standard of Review*

■ The Supreme Court has held that "a denial of benefits under [ERISA] § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a written plan confers upon an administrator such discretionary authority, a court must view its decisions with a "strong measure of deference" and may reverse only if the administrator's ultimate conclusions are "arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995); *see also Lynch v. New York City District Council of Carpenters Welfare Fund*, 1999 WL 177436, at *9 (S.D.N.Y. March 30, 1999) ("assuming the existence of a claim for breach of fiduciary duty, the inquiry is the same as that undertaken with respect to the first cause of action [under (a)(1)(B) ] namely, whether the Trustees' decision was arbitrary and capricious").

### B. *The Arbitrary and Capricious Standard Applies to Pharma-Care's Determination That Barr's Tamoxifen Was A Brand Name Drug*

■ The parties disagree over whether I should apply a *de novo* or arbitrary and capricious standard of review to Defendant's classification of Tamoxifen as a brand-name drug. Defendant argues that the Court should apply the arbitrary and capricious standard because the SPD gave it discretion to "construe the terms of the plan." Plaintiff counters that the Court

---

**5.** In any event, Plaintiff's claim for injunctive relief appears to be moot. The patent on Nolvadex® has long since expired and Barr's Tamoxifen has been categorized as generic since the patent expired. See above, p. 7.

should review her claims *de novo* because Defendant's determination was influenced by a conflict of interest. I agree with Defendant.

■ "In order to trigger de novo review of an administrator's decision when the plan itself grants discretion to the administrator, a plaintiff must show that 'the administrator was *in fact* influenced by the conflict of interest.'" *Armstrong v. Liberty Mut. Life Assur. Co. of Boston*, 273 F.Supp.2d 395, 403 (S.D.N.Y.2003) (quoting *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir.2000) (emphasis in original)).

Here, Plaintiff contends that PharmaCare's decision to classify Tamoxifen as a brand-name drug was based on its financial interest in the classification. In support of this argument, Plaintiff cites to the Mercure Memo, which indicates that Medi–Span's classification, on which PharmaCare relied, was driven by complaints by pharmacies about the lower reimbursement rates for Barr's Tamoxifen. The letter to which Plaintiff refers states, in relevant part:

> Back in January '94, we were questioned on whether the Barr brand was a generic product or not, and in following up with Barr, were informed that they were marketing the products as a generic version and that we should be using a "G" Gen-code. The change was made in our files, *and now Barr is getting complaints about lower reimbursement rates for their product by pharmacies.* They have requested that we change the Gen-code back to an "M" (co-licensed). In view of the long time before the patent expires (7 years), we are in agreement that this product is for practical purposes a co-licensed product, even though the Barr brand is sold under the generic name. We will be changing for the EOM (end of month) file (this memo dated 2/3/95), the Gen-

code to "M" for Nolvadex and Tamoxifen for those GP1's which have both brands available.

Def. Ex. 5 (emphasis added). Under Plaintiff's theory, the lower reimbursement rates cost pharmacies money (including CVS), and PharmaCare (because CVS owned it (Def. Ex. C at E–1)) benefitted from the higher rates or "reimbursement differentials" associated with the brand-name classification. Defendant contests Plaintiff's reading of the Mercure Memo, arguing that pharmaceutical companies were complaining about the "generic" reimbursement rate because the high acquisition costs of Barr's Tamoxifen made it economically infeasible for pharmacies to stock the drug at the lower rate.

Plaintiff has not shown that Defendant was in fact affected or influenced by any conflict of interest. As an initial matter, the Mercure Memo shows only that Medi–Span changed its database code at the request of Barr, not PharmaCare. Second, although Barr cited complaints from pharmacies as the reason for its request for change, it appears, on the face of the letter, that Medi–Span made the change because "[i]n view of the long time before the patent expires (7 years), we are in agreement that this product is for practical purposes a co-licensed product." Accordingly, I cannot say that the Memo constitutes evidence that PharmaCare was in fact conflicted. *See Couture v. UNUM Provident Corp.*,315 F.Supp.2d 418, 427 (S.D.N.Y.2004) (arbitrary and capricious standard applies where e-mails between claims administrator's account managers purportedly showing concern for the administrator's "bottom line" did not raise inference that administrator was in fact affected by conflict of interest when decision was made regarding employee's claim for long-term disability benefits).

### C. PharmaCare's Determination That Barr's Tamoxifen Was A Brand Name Drug Was Not Arbitrary and Capricious

 "Under the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo v. GNY Automobile Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003); *Peterson v. Cont'l Cas. Co.,* 282 F.3d 112, 117 (2d Cir.2002). The decision of a claim administrator will not be overturned unless it is found to be (1) without reason; (2) unsupported by substantial evidence; or (3) erroneous as a matter of law. *See O'Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d Cir.1995) (citations omitted); *Pagan,* 52 F.3d at 442. "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.' " *Celardo,* 318 F.3d at 146 (quoting *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995)).

Plaintiff claims that Defendant's classification of Tamoxifen was arbitrary and capricious for two reasons. First, she argues that it was legally erroneous. Second, Plaintiff claims that, in making the determination, Defendant's reliance on Medi–Span and letters from Barr was "suspect." Plf. Mem. of Law in Opp. to Def.'s Mot. to Dismiss at 20. Plaintiff is wrong on both counts.

#### 1. PharmaCare's determination was not incorrect as a matter of law.

 The Federal Food, Drug and Cosmetic Act (the "FFDCA") provides that, "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application ... is effective with respect to such drug." 21 U.S.C. § 355(a). A "new drug" is "any drug ... [which] is not generally recognized as safe and effective ... or ... which has not, otherwise than in [safety and effectiveness] investigations, been used to a material extent or for a material time ..." 21 U.S.C. § 321(p). The FDA is charged with approving the sale and marketing of all "new" drugs. *Nat'l Assoc. of Pharm. Mfrs., Inc. v. Ayerst Lab., Div. of/and Am. Home Prod.,* 850 F.2d 904, 907 (2d Cir.1988).

The Supreme Court has held that, broadly speaking, a generic drug is "a product that contains the same active ingredients but not necessarily the same [inactive] excipients [e.g., coatings, binders and capsules] as a so-called 'pioneer drug' that is marketed under a brand name." *United States v. Generix Drug Corp.,* 460 U.S. 453, 454–55, 103 S.Ct. 1298, 1299, 75 L.Ed.2d 198 (1983). In addition, generic drugs "are usually marketed at relatively low prices because their manufacturers do not incur the research, development, and promotional costs normally associated with the creation and marketing of an original product." *Id.* at 455 n. 1, 103 S.Ct. 1298.[6] Because the term "new drug" includes "entire drug products, complete with active and inactive drugs," a generic drug is considered a "new drug," and is subject to FDA approval "until the product ... no longer falls within the terms of [§ 231(p) ]." *Id.* at 459, 461, 103 S.Ct. 1298.

In a recent case, this Court outlined the FDA approval process through which a

---

**6.** Plaintiff concedes that Defendant's use of the term "generic" in Plan documents is consistent with this definition. Thus, the Plan states, "Generic prescription drugs are chemical copies of brand-name drugs. They are dispensed in the same dosage, packaged in the same strength and taken in the same way. They usually cost less, sometimes up to 50% less than brand-name drugs." Def. Ex. D at p. 40.

company may bring a new drug to market. *See In re Dr. Reddy's Laboratories, Ltd.,* No. 01 Civ. 10102(LAP), 2002 WL 31059289, *1 (S.D.N.Y. Sept.13, 2002).

As an initial step, the company must complete a New Drug Application ("NDA") that "demonstrates the drug's safety and efficacy for its intended uses." *Id.* (citations omitted). The NDA "must include, inter alia, drug samples, proposed labeling, and the results of clinical safety and efficacy tests." *Id.; see also* 21 U.S.C. § 355(b). Under the Hatch–Waxman Amendments to the FFDCA enacted by Congress in 1984 (the "Amendments"), however, subsequent applicants who wish to manufacture generic versions of the "pioneer" drug need only complete a more limited ANDA that relies on the FDA's previous determination that the drug is safe and effective. *Id.* at *2. The purpose of the Amendments is "to permit the competitors of pioneer drug companies to obtain expedited and cost-efficient approval of generic versions of bioequivalents of drugs that have already obtained prior FDA approval." *In re Dr. Reddy's Laboratories, Ltd.,* 2002 WL 31059289, at *1 (quoting *In re Buspirone Patent Litig.,* 185 F.Supp.2d 340, 345 (S.D.N.Y.2002)).[7]

The applicant is also required to file information related to existing patents or patent applications associated with the drug. *Id.* "Upon approval of an NDA or receipt of supplemental patent information, the FDA publishes the submitted patent information in a book called the 'Approved Drug Products with Therapeutic Equivalence Evaluations,' commonly referred to as the 'Orange Book.'" *Id.* (citing 21 U.S.C. §§ 355(b)(1) & (c)(2)).

Finally, "when a generic maker files an ANDA seeking approval of a generic version of a drug that is listed in the Orange Book, the applicant must certify that any patent information listed in the Orange Book does not bar FDA approval of a generic version of the drug [a "Paragraph IV certification"]." *Mylan Pharms., Inc. v. Thompson,* 139 F.Supp.2d 1, 6 (D.D.C. 2001) (citing 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)), *rev'd on other grounds,* 268 F.3d 1323 (Fed.Cir.2001).

Apart from the fact that it was distributed under its chemical name, Barr's Tamoxifen bears none of the hallmarks of a legally generic drug. First, Barr's Tamoxifen is chemically identical to AstraZenica's Nolvadex®. *See* Def. Ex. G at pp. 4–5 & 35. It was manufactured by AstraZeneca, not Barr, under the very same patent and in the very same facility as Nolvadex®. *See id.* Second, during the relevant period, Barr's Tamoxifen lacked the low price characteristic of a generic. *See* Def. Ex. O, Deposition of Gary Shramek, at p. 85 (noting that the price of Barr's Tamoxifen and AstraZeneca's Nolvadex® were "virtually the same ... within pennies, [in] some cases"). Finally, and most importantly, there is no evidence in the record that any generic manufacturer, including Barr, has ever obtained FDA approval for a generic version of tamoxifen. *See generally, Dr. Reddy's Laboratories,* 2002 WL 31059289, at *1–2; *In re Buspirone Patent Litig.,* 185 F.Supp.2d at 345; *Andrx Pharm., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 801 (D.D.C.2001); *Zenith Laboratories, Inc. v. Abbott Laboratories,* 1996 WL 33344963, at *1–2 (D.N.J. Aug.7, 1996).

Barr never obtained approval of its tamoxifen ANDA, and, instead, agreed to amend its ANDA to certify that it would not seek to manufacture its generic version of tamoxifen until AstraZeneca's patent expired. Plf. Ex. A at pp. 9–10, ¶ 24. Until

---

**7.** "Bioequivalence" refers to the rate at which, and the extent to which, the body absorbs the active ingredient(s) in the drug. 21 U.S.C. § 355(j)(8)(A); 21 C.F.R. § 320.1(e).

the expiration of its patent on August 20, 2002, AstraZeneca owned the exclusive right to manufacture, sell and license tamoxifen in the United States. *Id.* At the time that Plaintiff paid the alleged brand co-payments for Barr's Tamoxifen, AstraZeneca's patent prevented Barr and other manufacturers from producing a generic form of this product. *See id.*; *see also* Def. Ex. B.

During that same period, the Orange Book did not list any generic version of tamoxifen. *See* Def. Ex. F. Plaintiff disputes this, arguing that, "Barr's tamoxifen specifically was considered by the FDA in the Orange Book to be the 'therapeutic equivalent' of AstraZeneca's Nolvadex—in other words, a 'generic' drug." Plf. Reply Mem. at 16. But the language used to describe "single-source" drugs such as Barr's Tamoxifen contradicts Plaintiff's argument. *See* Plf. Ex. 7, Orange Book Preface at p. 10 ("Although not identified in the List, distributors or repackagers of an application holder's drug product are considered to have the same code as the application holder.").

Even if Plaintiff were correct, however, the Orange Book was created primarily to assist states in developing laws and regulations that "encourage the substitution of drug products," not to serve as evidence of the FDA's legal classification of a given drug. *Id.* at p. 1. In fact, the Preface of the Orange Book explicitly states, "Therapeutic equivalence evaluations in this publication are *not* official FDA actions affecting the legal status of products under the Act." *Id.* (emphasis added). Thus, whether or not Barr's Tamoxifen was "therapeutically equivalent" to Nolvadex®, as that term is defined in the Orange Book, has no bearing on the legal classification of Barr's Tamoxifen as generic or brand-named.

Moreover, existing authority does not support Plaintiff's claim that Barr was ever authorized to market or distribute an approved generic version of Nolvadex®. In the one case cited by Plaintiff for that claim, *Eon Labs Mfg., Inc. v. Watson Pharm., Inc.,* 164 F.Supp.2d 350 (S.D.N.Y. 2001), the manufacturer of the generic version of the drug doxycycline monohydrate (*not* Tamoxifen) sued the brand-holding manufacturer of the drug "Monodox," alleging violations of the Sherman Act, Lanham Act, the Robinson–Patman Act and state deceptive practices statute. In dismissing the plaintiff's price discrimination claim, Plaintiff notes, Judge Buchwald stated (in *dicta*) that "The [FDCA] permits a branded manufacturer also to sell a generic version of a drug under the same NDA, with the identical ingredients." *Id.* at 362. Plaintiff argues this is precisely what has happened here, and that "nothing legally precludes a patent-NDA holder from agreeing to weaken its valuable exclusive rights in settlement of patent litigation by contractually agreeing to allow the marketing and distribution of a competing generic version of its brand-name drug." Plf. Reply at 18 n. 12.

Plaintiff's interpretation of Judge Buchwald's statement appears to me to be incorrect. In *Generix Drug Co.,* the Court listed several criteria for determining whether a drug ought to be treated as "generic." 460 U.S. at 454–55, 103 S.Ct. 1298. Importantly, the Court specifically found that a "generic drug product," containing the same active ingredients, but not necessarily the same inactive ingredients, as the pioneer drug, is a "new drug" that is subject to FDA approval. Clearly, Barr's Tamoxifen certainly is not a "new drug" within the meaning of 21 U.S.C. § 321(p). Not only does it have the same active ingredients as Nolvadex®, it has the same inactive ingredients. It is, therefore, the same drug as Nolvadex®; it is only marketed under a generic. Thus, Barr's Tamoxifen did not require the additional FDA approval that would, as a matter of

law, be required to put a true "generic" drug on the market.

More recently (and far more apposite to this case), the Eastern District of New York, in a multi-district action called *In re Tamoxifen Citrate Antitrust Litigation*, 277 F.Supp.2d 121 (E.D.N.Y.2003) (Glasser, J.), found that the drug Barr was distributing under the name Tamoxifen could not have been a "generic" drug. In that case, the plaintiffs alleged that AstraZeneca agreed with Barr to monopolize and allocate the United States market for tamoxifen in restraint of trade. The court granted the defendants' motion to dismiss. In so doing, Judge Glasser ruled unambiguously that at all times relevant to Plaintiff Del Greco's complaint, there was no generic version of tamoxifen citrate on the market. *Id.* at 126, 137.

Specifically, Judge Glasser held: (1) No generic manufacturer ever obtained FDA approval to bring the drug tamoxifen to market, since all three manufacturers who filed with Paragraph IV certification failed to prove in court that AstraZeneca's patents were invalid; (2) as long as AstraZeneca's patent remained valid, it constituted an absolute bar to the manufacture and marketing of a generic form of tamoxifen; and (3) the product marketed by Barr prior to March 2002, when Astra Zeneca's patent expired, was a "licensed version of tamoxifen," which was distributed pursuant to a licensing agreement with the patent holder. *Id.* at 125–16, 136–138.[8]

### 2. PharmaCare's determination was supported by substantial evidence.

■ Finally, Plaintiff offers other assertions that she claims prove that Tamoxifen is a generic drug, and that, as such, PharmaCare violated ERISA. Specifically, Plaintiff asserts that Barr's Tamoxifen was identified as "generic" in the Barr–Zeneca Distribution and Supply Agreement, in a letter from Medi–Span to PharmaCare, in Barr's SEC Report, and in the New York State Board of Pharmacy List of Generic Equivalents ("NYS Pharmacy List"). *See e.g.*, Barr–Zeneca Distribution and Supply Agreement (providing that "Barr may accept order for the sale of generic tamoxifen on or after September 1, 1993, but not before that date"), Plf. Ex. 17 at ¶ 12(b); Mercure Memo (noting that tamoxifen was classified as a "generic" drug for co-payment purposes by Defendant from January 1994 until Barr directed Medi–Span to classify it as a "brand-name" drug in 1995), Plf. Ex. 5; Barr's SEC Report, referenced in Cmplt., ¶¶ 2, 29 (stating that "[t]he Company's largest selling product is Tamoxifen Citrate ("Tamoxifen"), the generic version of Nolvadex®."); and NYS Pharmacy List (identifying "TAMOXIFEN CITRATE" as a generic drug), Def. Ex. I.

8. Subsequent to filing their briefs, the parties continued to send letters to the Court citing additional authorities supporting their respective arguments. In one such letter, dated June 18, 2004, Plaintiff brought to the Court's attention an old decision, *Zeneca Inc. & Barr Labs., Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452(JGK), 1999 WL 509471, (S.D.N.Y.1999), in which Judge Koeltl, in several places, describes Barr's Tamoxifen as a "generic" drug. *Id.* at **1, 3 and 38. In *Eli Lilly*, both Zeneca and Barr, as intervenor, brought claims of unfair competition and deceptive trade practices against a third company that was marketing a product which also claimed to "reduce the risk of breast cancer." The case provided only a conclusory discussion of the Barr–Zeneca settlement agreement, and did not analyze the parameters of either party's legal rights to tamoxifen under the agreement. In fact, as both Barr and Zeneca were plaintiffs in Eli Lilly, with a common interest having nothing to do with their rights under the settlement agreement, there was no reason for the court to conduct such an analysis. Under such circumstances, I do not find Judge Koeltl's characterization of the drug as "generic" particularly persuasive.

These additional "sources," however, do not persuade the Court that Barr's Tamoxifen must be considered a "generic" drug as a matter of law. The legal standards for generic drugs are what they are, and the writers of private letters or reports to the SEC have no authority to change those standards. In *Pharmaceutical Soc. of the State of New York v. Lefkowitz,* 454 F.Supp. 1175 (S.D.N.Y.1978), the plaintiffs challenged the constitutionality of the Generic Drug Act, which amended New York's Public Health and Education Laws for the purpose of "mak[ing] available to customers cheaper generic drugs in lieu of more expensive brand name drugs which have been prescribed for them by physicians and others authorized by law to write medical prescriptions." *Id.* at 1178; *see also* N.Y. Education Law (McKinney) §§ 6810(6), 6816–a. Specifically, the laws "require[ ] the Commissioner of Health of the State of New York to establish and publish a list of drug products approved by the commissioner of the [FDA] as being safe and effective and which have not been identified by the FDA as having any problem of bioequivalency." *Id.* The laws also require that every "prescription form … contain the legend: 'This prescription will be filled generically unless physician signs on the line stating 'dispense as written.' ' " *Id.* Finally, "If the prescriber approves a substitution he must inform the patient that the pharmacist will substitute a cheaper drug product." *Id.*

One basis for the plaintiffs' constitutional challenge was that the Generic Drug Act had been preempted by FDA regulations. In denying the plaintiffs' request for injunctive relief, the court held that "Congress has not legislatively expressed an intent to preclude states from entering the area of drug regulation." *Id.* at 1179. On appeal, the Second Circuit affirmed, holding "there is no actual conflict between the federal and state statutes" because the Generic Drug Act "regulate[s] the sale of drugs *to the limited extent* of preventing the patient-consumer from being forced to pay the higher price of brand name drugs when less expensive generic equivalents are available and his physician is willing to permit use of the substitute," while the "[d]etermination of the safety and efficacy of the generic substitutes remains the function of the FDA." *Pharmaceutical Soc. of the State of New York v. Lefkowitz,* 586 F.2d 953 (2d Cir.1978) (emphasis added); *see also* Orange Book Preface, Plf. Ex. 7 at p. 9 (noting that the Orange Book "does not mandate the drug products which may be purchased, prescribed, dispensed, or substituted for one another, nor does it, conversely, mandate the products that should be avoided … Therapeutic equivalence evaluations are a scientific judgment based upon evidence, while generic substitution may involve social and economic policy administered by the states, intended to reduce the cost of drugs of consumers").

In this case, Plaintiff argues that PharmaCare's actions were "arbitrary and capricious" because it treated Barr's Tamoxifen "as a generic drug for the purposes of the [state generic substitution laws] while inconsistently treating it as a brand-name drug for the co-payments of plaintiff and the Class." Plf. Mem. at 23. As evidence of this inconsistent treatment, Plaintiff cites to an undated form letter on Barr letterhead, signed by, "Harold E. Cohen, Director of Professional Relations, Barr Laboratories." Plf. Ex. 9. The letter, entitled "Important Message to Pharmacists about Barr's Tamoxifen Citrate," states essentially that Barr's Tamoxifen could be substituted under state generic substitution laws yet treated as a brand-name drug for pharmacy reimbursement purposes. *Id.* Plaintiff also contends that the NYS Pharmacy List lists tamoxifen citrate as a generic drug as of April 1, 1998. Defendant disputes this as a matter of fact.

Assuming that the NYS Pharmacy List does in fact list tamoxifen citrate as a generic equivalent in 1998, I nevertheless find that nothing about that listing compelled PharmaCare to classify Barr's Tamoxifen as a generic drug for co-payment purposes under the Plan. Plaintiff has not, and cannot, direct the Court to any authority stating that state generic substitution laws circumscribe a plan administrator's absolute discretion to make determinations about co-payment levels (a plan benefit) under its plan. Under the Agreement with North Shore, PharmaCare "ha[d] the discretionary authority and responsibility to interpret, construe and make determination under the applicable coverage option." Def. Ex. D at p. 74. The state laws, at best, constituted an alternative legal source for Defendant to consider in deciding how best to classify Tamoxifen for co-payment purposes under the Plan. Therefore, I cannot say that Defendant's classification of Tamoxifen was incorrect as a matter of law.

Plaintiff also contends that Defendant's classification of Tamoxifen was arbitrary and capricious because it failed to consult experts or to consider available "recognized compendia" in reaching its determination. Defendant disputes this, arguing that it reasonably relied on the classification of Tamoxifen in Medi–Span's database and on a letter from Barr to Gretchen Keach, dated October 9, 1996.

It is undisputed that Medi–Span classified Barr's Tamoxifen as a brand-name drug between October 4, 1996 and February 25, 2003. Further, PharmaCare's reliance upon Medi–Span's determination that Tamoxifen was a brand-name drug was reasonable. Indeed, the Agreement specifically required PharmaCare to "maintain a plan-specific NDC (National Drug Code) file for prescription drugs . . . [and] update the NDC file weekly from information provided by Medi–Span Corporation's [database]." Def. Ex. C at p. 16, ¶ I(f)(3).

Similarly, in *Fitch v. Chase Manhattan Bank,* 64 F.Supp.2d 212 (W.D.N.Y.1999), the alleged plan fiduciary relied upon benefits calculations of employees of "one of the largest and most reputable actuarial firms in the country." *Fitch,* 64 F.Supp.2d at 230. The court concluded that the plan fiduciary did not act in an arbitrary and capricious manner, and, thus, did not violate ERISA, when it relied upon those benefit calculations. *Id.* The court explicitly reasoned that:

[t]he regulations interpreting ERISA state that a plan fiduciary may rely on *information and analyses* furnished by persons performing ministerial functions for the plan, provided that he has exercised prudence in the selection and retention of such persons . . . . The plan fiduciary will be deemed to have acted prudently in such selection and retention if, in the exercise of ordinary care in such situation, he has no reason to doubt the competence, integrity or responsibility of such persons . . . . Therefore, under the regulations, the defendants were entitled to rely upon [the] calculations and the fact that some of the calculations turned out to be inaccurate does not established that the defendants breached a fiduciary duty.

*Id.* (emphasis added).

Medi–Span is the health care industry's leading source for information relating to medications. *See* Exhibit E. The fact that Medi–Span based its classification in part on Barr's recommendations is not sufficient grounds to have caused PharmaCare to doubt Medi–Span's competency, integrity or responsibility. *See* Shramek Dep. at 65–66, Plf. Ex. 12 (Shramek stating "[T]he way I was told back then, the manufacturer tells the drug databases how they want things to be adjudicated."). Therefore,

PharmaCare's reliance upon Medi–Span's designation was reasonable, and could not be arbitrary and capricious. *Fitch,* 64 F.Supp.2d at 230.

In addition, the administrative record evidences that Defendant, through representatives who have knowledge and expertise in the drug industry, conducted thorough inquiries and reviews of leading sources and compendia to confirm that Barr's Tamoxifen was properly classified as a brand drug.

Gary Shramek, R.Ph. ("Shramek"), a registered pharmacist with clinical knowledge and expertise in the drug industry, conducted thorough investigations to verify that the proper classification of Barr's Tamoxifen was "brand." *See* Shramek Dep. at pp. 53–63, Def. Ex. O; Shramek Curriculum Vitae, Def. Ex. P. In late 1994 or 1995, Shramek contacted AstraZeneca and Barr, and "received in writing from both companies that the product is the brand product, and Zeneca manufactured it and sold it to Barr for distribution." Shramek Dep. at p. 54, Def. Ex. O. In addition, he contacted Medi–Span and examined the FDA's Orange Book. *Id.* at 55. According to Shramek, Tamoxifen did not appear in the Orange Book because "the innovator makes both products, and it's the same product." *Id.* Moreover, Shramek considered the Mercure Memo. *Id.*

Mark Marshall, Director of Account Management at PharmaCare, who also has extensive experience in the plan benefits management industry, was involved in two separate inquiries regarding the proper classification of Barr's Tamoxifen. Representatives of two of Mr. Marshall's PharmaCare accounts, HealthPartners and WellCare, contacted him in early 2001, each questioning whether Barr's Tamoxifen was properly characterized as a brand or generic product. Marshall Dep., at pp. 87–94; E-mails between PharmaCare and WellCare, and between PharmaCare and HealthPartners ("PharmaCare E-mails"), Def. Ex. Q. Before Mr. Marshall could reply to the inquiry of HealthPartners' administrator, Pharmacist Eelkema, HealthPartners' own chief clinical pharmacist, contacted First DataBank, Medi–Span's competitor, and provided a response to the administrator. *Id.* Pharmacist Eelkema responded that First DataBank classified Barr's Tamoxifen as a "brand" product and that patients should pay a "brand" co-pay. *Id.*

WellCare made a similar inquiry, and received a like response. Marshall Dep. at p. 55. After consulting with PharmaCare's Clinical and Plan Operations Department, Mr. Marshall responded as follows:

> Tamoxifen is the generic name for Nolvadex, but there are no generic products on the market. Tamoxifen is a co-licensed Multi–Source Brand produced by Barr, which is owned by ICI, the makers of Nolvadex. There are no generic alternatives in this therapeutic class."

*Id.*; PharmaCare E-mails.

The evidence shows that PharmaCare performed several investigations and considered numerous sources, over the course of years, regarding Medi–Span's classification of Tamoxifen as a "brand" drug. In particular, the letters from Barr to PharmaCare and the Mercure Memo show that PharmaCare sought-and received-some clarification of the classification of Barr's Tamoxifen as a "brand" drug during the Class Period. *See* Letter from A. Sage Middlesworth to Gretchen Keach, dated October 9, 1996, Def. Ex. B; Letter from Leah Ann Spinelli to Paula Bashaw, dated October 25, 2002, Def. Ex. B; Mercure Memo, Def. Ex. N. Other professionals in the health care field, such as First DataBank and HealthPartners, independently came to the same conclusion as PharmaCare.

Some of the conclusions reached by these sources may have been questionable, but they were not unreasonable, and there was "some evidence" to support them. In light of the foregoing, I conclude that Defendant's determination was supported by substantial evidence.

Accordingly, PharmaCare's classification of Barr's Tamoxifen as a "brand" drug for co-payment purposes was not arbitrary and capricious, and the Court must grant Defendant's motion for summary judgment and dismiss Plaintiff's Complaint with prejudice.

## CONCLUSION

Defendant's motion is granted for the reasons stated herein. The complaint is dismissed with prejudice. The Clerk of the Court is directed to enter judgment dismissing the complaint and to close the file.